**UNITED STATES of America**

v.

**Shelly Grant GAMBLER, aka Grant Gambler, Appellant.**

No. 80–1825.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1981.

Decided Aug. 13, 1981.

Melinda Gray Murray, Washington, D. C. (appointed by this court) for appellant.

Regina C. McGranery, Asst. U.S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U.S. Atty., John A. Terry, Michael W. Farrell and Eric B. Marcy, Asst. U.S. Attys., Washington, D. C., were on the brief, for appellee.

Before TAMM, WALD and MIKVA, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

Dissenting opinion filed by Circuit Judge MIKVA.

TAMM, Circuit Judge:

Shelly Grant Gambler was convicted of wire fraud, false pretenses, and larceny after trust. He urges reversal of these convictions on various grounds. Finding no prejudicial error committed by the trial court, however, we affirm these convictions.

Appellant managed an interior decorating business in which he recommended furniture and furnishings to clients and filled orders placed by them. Among Gambler's clients were J. Stanley Pottinger and Richard and Barbara Cohen. On October 2, November 17, and December 5, 1978, Pottinger and Gambler executed three contracts for appellant's services and for the purchase of furniture and curtains. Trial Transcript (Tr.) 6, 14, 18. The contracts required a fifty percent deposit to authorize the placement of orders for purchases, with the remaining fifty percent plus commission due within sixty days. Tr. 9. Pottinger made several payments and testified at trial that throughout that winter he received consistent assurances that everything was operating on schedule. Tr. 25–26. He testified specifically that prior to his payment on January 31, 1979, appellant had represented to him that his furniture had been ordered. Tr. 130–31. After much prevarication, however, Gambler informed Pottinger on May 11 that he had not placed any orders. Tr. 40–41.

Appellant had done a substantial amount of work for Richard and Barbara Cohen in the past. On February 1, 1979, Gambler recommended that the Cohens order certain living room furniture and pay him the full wholesale cost which, Barbara Cohen testified, appellant stated would ensure expedited delivery of the furniture. Tr. 147. Barbara Cohen gave Gambler a check for the full wholesale cost of the furniture on February 2. After several assurances that the furniture was in transit, Tr. 148, Gambler informed Richard Cohen in May that the furniture had not even been ordered. Tr. 167.

The grand jury returned a five-count indictment against appellant on March 26, 1980, charging him with wire fraud, false pretenses, and three counts of larceny after

trust.[1] The counts of wire fraud and false pretenses related to Gambler's obtaining the January 31 check from Pottinger, while the larceny after trust counts concerned two payments made by Pottinger and one by Barbara Cohen.

At trial, Gambler testified that his business was an undercapitalized operation subject to wide swings in income. He maintained one business checking account in which all funds received, whether for services or furniture orders, were deposited and out of which all expenses were paid. Contradicting Pottinger's testimony, appellant stated that he had told Pottinger not to expect delivery until the late spring. Tr. 225–26. He explained that any references to the placement of orders prior to Pottinger's payment in January of 1979 referred to the placement of items "on reserve." Tr. 252. Gambler explicitly denied any intent to defraud either Pottinger or Barbara Cohen. Tr. 242. Furthermore, he cited several reasons for the delay in placing orders. He claimed that he did not become concerned about his ability to fill these clients' orders until late March or early April of 1979. Tr. 239.

The jury found Gambler guilty as charged after a three-day trial. United States District Judge Harold H. Greene imposed a sentence of three years imprisonment, but suspended that sentence and placed Gambler on probation for five years upon two conditions: 1) that he make full restitution to Pottinger and Cohen when allowed to do so by the Bankruptcy Court, and 2) that he accept suitable employment with the assistance of the probation department. (July 7) Tr. 5–6. Gambler filed a timely appeal.

█ Appellant makes three major arguments in this court. First, Gambler contends that he was improperly convicted of larceny after trust because he had no obligation to apply the specific money received from the complainants for their use and benefit. Appellant argues that, therefore, no trust relationship existed as a matter of law. Second, Gambler contends that he requires a new trial because the district court failed to instruct the jury on his "good faith" defense to the charges of wire fraud and false pretenses, crimes that require the proof of intent to defraud. Third, appellant submits that the district court committed reversible error by limiting cross-examination of a complaining witness.[2]

█ Gambler's first contention need not detain us long. Under *United States v.*

---

1. The statutes under which appellant was charged provide in pertinent part as follows:

 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communications in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined . . . or imprisoned . . . .

 18 U.S.C. § 1343 (1976) (wire fraud).

 (a) Whoever, by any false pretense, with intent to defraud, obtains from any person any service or anything of value . . . shall . . . be imprisoned. . . .

 D.C.Code Ann. § 22–1301 (1973) (false pretenses).

 If any person entrusted with the possession of anything of value, including things savoring of the realty, for the purpose of applying the same for the use and benefit of the owner or person so delivering it, shall fraudulently convert the same to his own use he shall, where the value of the thing so converted is $100 or more, be punished by imprisonment . . . or by a fine. . . .

 D.C.Code Ann. § 22–2203 (1973) (larceny after trust).

2. Gambler also argues that the count charging larceny after trust from Cohen should have been severed from the other four counts of the indictment. We find no merit in this argument. Federal Rule of Criminal Procedure 8(a) clearly allows the joinder of two or more offenses of the same or similar character. Furthermore, the district court did not abuse its discretion in denying the motion for severance under Federal Rule of Criminal Procedure 14, where the evidence would have been mutually admissible in separate trials. Fed.R.Evid. 404(b). *See generally United States v. Lewis,* 626 F.2d 940, 944–45 (D.C.Cir.1980).

 Appellant has made contentions other than those addressed in this opinion that we have examined and found without merit.

*Orsinger,* 428 F.2d 1105 (D.C.Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 61 (1970), it is clear that whether the requisite trust relationship, as opposed to a debtor-creditor relationship, existed between the defendant and his clients, "depends upon all of the facts and circumstances, including the intention of the parties." *Id.* at 1112. Our review of the record in this case leaves us convinced that the trial judge, although finding the legal sufficiency a close question, committed no error by submitting this question to the jury, Tr. 195, and that there was adequate evidence for the jury to find as it did. *See, e. g.,* Tr. 16–17, 129–30, 159–60.

■ Appellant's second contention may also be readily dismissed. His challenge to the district court's refusal to deliver a requested instruction must be judged by viewing the instructions as a whole. *United States v. Westbo,* 576 F.2d 285, 289 (10th Cir. 1978); *United States v. Martin,* 475 F.2d 943, 947 (D.C.Cir.1973). A review of the instructions given by Judge Greene in this case reveals that the trial court took care to emphasize the Government's burden of proving the element of specific intent beyond a reasonable doubt. Tr. 332–33, 336–38. We believe that these instructions sufficiently covered the particular point raised by appellant's requested "good faith" instruction. Defendant's Requested Instruction No. 4; Supplemental Tr. S–13. *See United States v. Westbo,* 576 F.2d at 289; *Cortez v. United States,* 328 F.2d 51, 54 (5th Cir.), *cert. denied,* 379 U.S. 848, 85 S.Ct. 89, 13 L.Ed.2d 52 (1964).

Appellant's third contention cannot be so easily dismissed. He argues that he was inappropriately limited in his attempt to probe the accuracy and veracity of statements made by the Government's chief witness Pottinger. In particular, appellant objects to the district court's refusal to allow him to cross-examine Pottinger regarding two civil suits instituted by Pottinger against appellant. Appellant contends that, on the basis of the rationale articulated by this court in *Villaroman v. United States,* 184 F.2d 261 (D.C.Cir.1950), this refusal to allow cross-examination for bias constituted prejudicial error.

■ In *Villaroman,* this court reversed a conviction where the district court had refused to allow cross-examination of the complaining witness on the subject of that witness's pending civil suit against the defendant arising out of the same circumstances as the crime with which the defendant was charged. A general rule has evolved from this case and others to the effect that the trial court should allow cross-examination and the airing of evidence with respect to a witness's pending, or even contemplated, suit against the defendant. *See* 3 Weinstein & Berger, Weinstein's Evidence § 607[03] (1978) and 3A Wigmore, Evidence §§ 949–952 (Chadbourn rev. 1970), and cases collected therein. By allowing a probe into the circumstances of a pending or contemplated lawsuit, it is believed that a defendant may bring to light two factors reflecting the possible bias of the witness: his pecuniary interest in the outcome of the criminal trial and the existence and degree of animosity he may harbor against the defendant.

■ In this case, however, we are not presented with a situation in which defense counsel sought to probe the subject of pending or contemplated litigation by a witness against the defendant, but one in which counsel attempted to elicit information regarding *past* litigation. Counsel attempted to extract such information solely to suggest to the jury that Pottinger possessed "considerable hostility" against the defendant that could color his testimony. Brief for Appellant at 30. We cannot assume, as appellant apparently has, the automatic application of *Villaroman* to the case at hand. Here appellant has made no attempt to argue that Pottinger possessed, in this context, any pecuniary interest in the outcome of the trial, a substantial reason for the decision in *Villaroman.* Moreover, we have discovered very little authority discussing the discretion of trial courts to limit cross-examination in similar circumstances, wherein the defendant would have the jury infer hostility, and thereby a motive to fal-

sify testimony, from attempts, now terminated, by a victim to recover compensation for harm perpetrated by the defendant. A state appellate court addressed an analogous situation in a fraud case in which a trial court had foreclosed an inquiry by the defense into the knowledge of the complaining witness before he filed a complaint that the defendant had instituted bankruptcy proceedings. The court affirmed the conviction, noting that the witness,

> as a victim of a crime, stands in the same position as any other victim of a crime and his motive, whether it was outrage due to the crime or a desire for revenge because of the crime, has no relevance to the question of the guilt or innocence of the defendant or the truth or falsity of the testimony.

*People v. Mitchell*, 50 Ill.App.3d 120, 7 Ill. Dec. 900, 365 N.E.2d 185, 189 (App.Ct.1977). Neither these sentiments nor the rationale of *Villaroman* readily suggests the resolution of the issue here presented. Absent controlling precedent, we must examine closely the particular circumstances of this case to determine whether the district court exceeded the bounds of its discretion. We are certainly aware that trial courts should give great latitude to defense counsel upon cross-examination of Government witnesses, especially in the area of bias and interest. *See Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

The circumstances into which defense counsel sought to inquire cannot be set forth in any summary fashion. Pottinger apparently filed two civil suits against Gambler in an attempt to recover the monies paid out, one suit in New York on May 25, 1979, and another in the District of Columbia approximately three weeks later. Tr. 103. The amount requested in each suit was $109,000, including $30,000 for loss of business opportunities and $50,000 for pain and suffering. Gambler filed for bankruptcy on June 29, 1979. Tr. 241. Pottinger then filed papers in that proceeding seeking to disallow the discharge of claims he possessed against Gambler. In October of 1979 Gambler filed a lawsuit for defamation against Pottinger.[3] This lawsuit was settled, however, in a complex agreement in which, among other things, Gambler acknowledged that his suit was groundless and executed a promissory note to Pottinger in the amount of $5,000. In return, Pottinger agreed not to pursue the claims of fraud in the bankruptcy proceeding. (May 6) Tr. 6. Pottinger received no money from that proceeding, however, because no assets were discovered. Tr. 104.

At trial, defense counsel attempted to introduce these past proceedings, stating to Pottinger, "I believe you indicated that you initiated a civil suit?" Tr. 102. Upon objection, defense counsel explained the necessity for his proposed inquiry:

> it is a matter of showing his hostility toward Mr. Gambler in connection with the type of claims he asserted and his bias against Mr. Gambler, which in turn I think is legitimate for the jury to consider in evaluating his testimony. *This is what he thought he was entitled to, this is what he sued for and he has not received a penny.*

Tr. 104 (emphasis added). Although noting "some relevance" of the inquiry to bias, the judge ruled that "its relevance is outweighed by confusion of the issues, particularly now that we have to get into the question of bankruptcy, what happened to the bankruptcy proceeding, why it was discharged, and so on." Describing the inquiry as "too far removed," the judge sustained the prosecutor's objection.

In attempting to explore the concluded litigation, defense counsel appeared most intent, at trial and in this court, upon having the jury learn of the *amount* of damages sought by the complainant in the three different contexts, perhaps to reflect the large measure of animosity allegedly possessed by the witness against the defendant. Were this information introduced,

---

**3.** (May 6) Tr. 5. The facts of this suit and its settlement are based upon the representations made by counsel for Pottinger in open court.

however, the prosecution might well have sought to reexamine Pottinger, and other lawyers employed by him, to establish the validity of the damages sought in the complaint. Balancing the questionable probative value of this amount as indicative of the witness's hostility versus the delay and confusion of the issues resulting from such an extended inquiry, the district court did not abuse its discretion in excluding this evidence. *See State v. Ballas*, 41 Conn.L.J. 47 (1980); *Brooks v. State*, 259 Ind. 678, 291 N.E.2d 559, 560 (1973).[4]

██ We believe, however, that the district court did err in sustaining an objection to the initial inquiry made by defense counsel on the subject of Pottinger's lawsuits against the defendant. In so ruling we do not stray from our belief that this case is not controlled by *Villaroman*. Rather, the rationale for our decision is the same as in any other case where the defendant seeks to establish the hostility, and thereby possible bias, of a witness for the prosecution: the defendant must be allowed, either through cross-examination or admission of extrinsic evidence, to set out for the jury the basic facts from which the jury may infer hostility. Pottinger's initiation of legal action may be profitably compared with the existence of a quarrel between him and Gambler. *Cf. Greatreaks v. United States*, 14 Alaska 610, 211 F.2d 674, 676 (9th Cir. 1954). That hostility may be inferred from such a "quarrel" seems to us a reasonable possibility; the exclusion of such discrediting evidence from the view of the jury was therefore erroneous.

We are not unsympathetic to the position in which the district court found itself. Defense counsel sought to explore much more than the bare facts of the litigation between Pottinger and Gambler. *See* page 838 *supra*. The court thus believed itself forced either to allow defense counsel to plunge ahead with his involved exploratory cross-examination or to halt the inquiry ab initio. Although we are loathe to second-guess district courts on such evidentiary matters, we believe that a proper balancing of the defendant's right of cross-examination with the factors of delay and confusion, factors properly considered by the district court, would have resulted in the allowance of a limited examination on this point. As this court has previously stated:

> Our decisions reflect great solicitude for an endeavor by the accused to establish bias on the part of a prosecution witness. They establish the propriety of the showing either by cross-examination or by extrinsic evidence, and indicate the broad range over which the inquiry may extend. We have admonished, however, that when the accused has been afforded a reasonable opportunity to make the point, the trial judge has discretionary authority to limit the scope of the proof. And courts have traditionally exercised their inherent power to confine the impeaching effort to evidentiary items possessing a potential for connoting bias.

*Austin v. United States*, 418 F.2d 456, 459 (D.C.Cir.1969) (footnotes omitted).

This case does not present a question of the trial judge's control over the testimonial scope of cross-examination. *See United States v. Slade*, 627 F.2d 293 (D.C.Cir.1980). Instead, the trial judge here foreclosed any inquiry into Pottinger's unsuccessful litigation against Gambler. Our finding of error does not, however, mandate reversal of appellant's conviction. In this case the district court's failure to allow defense counsel to establish the existence of the witness's prior lawsuits did not affect the substantial

---

4. The dissent would have us assume that district courts regularly exercise their discretion to admit evidence of the damage amount pleaded in civil complaints in circumstances such as the one presented here. Because we believe that evidence of this type is generally of minimal probative value, resulting inevitably in confusion of the issues and delay, we cannot join such an assumption. Instead, we believe that, on the facts of this case, a judgment to exclude evidence of the damage amount would be dictated by common sense and an awareness of the practicalities of human conduct. We are confident, moreover, that district courts, while never relaxing their vigilant protection of the rights of defendants, will continue to exercise their considered judgment on such matters.

rights of the accused and was harmless error beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Here the jury was fully aware that Pottinger had not received either any of the furnishings ordered or any return of the deposits placed with the defendant. Tr. 47–48. The jury may even have been aware that Pottinger had sued Gambler, through a reference by Pottinger himself and, more readily, because of explicit comments made by the defendant. Tr. 119–20, 240–41.

Moreover, the defendant was able to present to the jury evidence of Pottinger's pecuniary interest in the outcome of the trial. The district court, recognizing that the possible financial stake of a witness in the outcome of a case is an appropriate subject for cross-examination, *Wheeler v. United States*, 351 F.2d 946, 947 (1st Cir. 1965), allowed defense counsel to inquire into possible tax deductions available to Pottinger for the losses incurred through transactions with the defendant and the effect of the defendant's conviction upon that availability. The jury was thus given reason to question the disinterested nature of Pottinger's testimony, especially in light of the court's explicit instruction on that testimony.[5] Under these circumstances, we believe that the relevance and probative force of the excluded evidence was insufficient to require reversal of appellant's con-

viction. *Harris v. United States*, 371 F.2d 365, 367 (9th Cir. 1967).

 Dicta in some cases suggest that erroneous restriction of a defendant's cross-examination of a Government witness mandates reversal of the conviction without consideration of the relative harmlessness of the error. *See, e. g., United States v. Uramoto*, 638 F.2d 84 (9th Cir. 1980). This language apparently stems from a sentence in the Supreme Court's opinion in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The Court stated: "Petitioner was thus denied the right of effective cross-examination which ' "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." *Brookhart v. Janis*, 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314.' " *Id.*, 415 U.S. at 318, 94 S.Ct. at 1111. We believe, however, that the Supreme Court did not intend that even a "minor lapse" committed by the trial court in limiting cross-examination, *Douglas v. Alabama*, 380 U.S. 415, 420, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965), requires reversal, and, as explained below, we agree with those courts that have refused to apply a per se rule of reversal in such circumstances. *E. g., United States v. Price*, 577 F.2d 1356 (9th Cir. 1978), *cert. denied*, 439 U.S. 1068, 99 S.Ct. 835, 59 L.Ed.2d 33 (1979);[6] *United*

---

5. Mr. Pottinger said, as I recall it, that it was his intention to claim a deduction on his income tax return for 1979 as a result of not receiving the furniture that he had ordered from the defendant. Under the law Mr. Pottinger is not entitled to any deduction on his income tax return just because he might have suffered a financial loss in this commercial transaction. He would be entitled to a deduction from his taxes if that loss was the result of a theft or larceny or criminal fraud or false pretenses. Mr. Pottinger would not have to show to the Internal Revenue that Mr. Gambler committed these offenses particularly, but if he did make a claim that a theft occurred, a conviction of this defendant of one or more of these charges, would obviously support any claim by Mr. Pottinger for a tax deduction. Accordingly, he does have a financial interest in the outcome and you may consider that fact in your consideration and weighing of his testimony just as you consider any interest anybody else may have

in the outcome of the case in weighing their testimony.
Tr. 328.

6. Different panels of the Ninth Circuit offer varying interpretations of the intersection of harmless error doctrine and the confrontation clause. *Compare United States v. Price*, 577 F.2d 1356 (9th Cir. 1978), *cert. denied*, 439 U.S. 1068, 99 S.Ct. 835, 59 L.Ed.2d 33 (1979) *with Patterson v. McCarthy*, 581 F.2d 220 (9th Cir. 1978) *with United States v. Uramoto*, 638 F.2d 84 (9th Cir. 1980) *with Chipman v. Mercer*, 628 F.2d 528 (9th Cir. 1980). In *Chipman* the court admitted the "seeming harshness" of confrontation clause doctrine that "appears to require reversal if there is *any* error, whether the error was harmless in the particular case . . . ." *Id.* at 533 (emphasis added). This court goes on to observe, however, that

 a confrontation clause violation generally does not occur unless the denied area of

*States v. Brown,* 546 F.2d 166 (5th Cir. 1977); *United States v. Duhart,* 511 F.2d 7 (6th Cir.), *cert. dismissed,* 421 U.S. 1006, 95 S.Ct. 2409, 44 L.Ed.2d 675 (1975).

In *Davis,* the Court held that a state interest in preserving the confidentiality of juvenile adjudications of delinquency must give way to the defendant's right of cross-examination guaranteed by the confrontation clause. The trial court had foreclosed inquiry into the probation status of the Government's only eyewitness, seventeen year-old Richard Green, who had identified the accused near the scene of the crime. Defense counsel sought to question Green on his probation status to suggest not only that he had made a hasty identification to shift suspicion away from himself but also that he had made the identification under fear of possible probation revocation. In rejecting the state supreme court's conclusion that counsel had conducted cross-examination sufficient to develop the issue of bias, the Court stated as follows:

> While counsel was permitted to ask Green *whether* he was biased, counsel was unable to make a record from which to argue *why* Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness or, as the prosecutor's objection put it, a "rehash" of prior cross-examination. On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the

right of effective cross-examination which " 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' *Brookhart v. Janis,* 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314." *Smith v. Illinois,* 390 U.S. 129, 131, 88 S.Ct. 748, 749, 19 L.Ed.2d 956 (1968).

*Davis,* 415 U.S. at 318, 94 S.Ct. at 1111.

*Davis* was the first case in which the Court explained an accused's right of confrontation in terms of "effective" cross-examination. It can be read to establish the principle that the denial of "effective" cross-examination is per se reversible error. The analysis undertaken by the Court makes clear, however, that not every erroneous limitation of cross-examination would constitute a denial of effective cross-examination. 415 U.S. at 317–18, 94 S.Ct. at 1110–1111. Where, as here, the evidence sought to be presented to the jury is of such limited relevance and minimal probative force, we believe that *Davis* permits the conclusion that the trial court's error is to be evaluated under the harmless error standard set forth in *Chipman.* Prior to *Davis,* the Court had explicitly applied this standard to confrontation clause violations. *See, e. g., Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). *See generally United States v. Price,* 577 F.2d at 1362–64; Note, *Constitutional Restraints on the Exclusion of Evidence in the Defendant's Favor: The Implications of Davis v. Alaska,* 73 Mich.L.Rev. 1465 (1975).

We do not apply the doctrine of harmless error lightly. In most cases, it may well be that an erroneous initial limitation upon cross-examination of an appropriate area could not be found harmless. In this case, however, we believe, beyond a reasonable doubt, that no juror would have been swayed by whatever suggestions of hostility and consequent implications of bias might have arisen from the knowledge that the

cross-examination is one of considerable relevance. Degree of relevance, in turn, bears a close relation to whether denial of confrontation was prejudicial.... The automatic reversal rule is not, therefore, entirely divorced from considerations of prejudicial error in its

ultimate operation, even if it is so in its bare statement.
*Id.* We believe that such an analysis supports the view that not all erroneous restrictions upon cross-examination mandate a new trial for the accused.

witness had undertaken profitless civil litigation against the defendant on the matter in question.[7] The jury's knowledge of the witness's pecuniary interest in the outcome of the trial, as made explicit by the court in its instruction, provides further support for this conclusion.

Appellant received a fair trial; the trial court's rulings to which he takes exception give us no cause to overturn his convictions. Although we, like the district court, may question the propriety of the prosecutorial discretion exercised in this case, *see* (July 7) Tr. 3–5, we have discovered no reversible error in this proceeding. The judgment of the district court is therefore

*Affirmed.*

MIKVA, Circuit Judge, dissenting:

A trial court cannot permit the government to shield its complaining witness from the probing cross-examination that our system of justice accords a criminal defendant. The right to cross-examine is particularly imperative when an articulate and determined witness, whose testimony is the only real evidence that a crime has in fact occurred, has shown a potential bias by filing a lawsuit against the defendant. I believe that the trial judge's error in curtailing inquiry into Pottinger's effort to bring a $100,000 damage suit against Gambler deprived the jury of evidence that could have seriously diminished Pottinger's credibility.

Accordingly, I cannot agree that this error was harmless, and I must respectfully dissent.

The facts underlying this prosecution are amply stated in the majority opinion, and there is no need to recount them here.[1] The opposing positions at trial, however, may bear some repetition. Gambler's defense was that he had no intention to defraud. He claimed that he had merely postponed ordering the merchandise, and that he would have paid the manufacturers and accomplished the delivery in the spring if he had not run out of money. Gambler also denied making false representations.

The government's only witnesses in its case in chief on the Pottinger counts were Pottinger himself and an FBI agent who testified about Gambler's bank account and other financial records.[2] Only Pottinger's testimony related to the possibility of fraudulent representations by Gambler, and there were no documents reflecting a statement by Gambler that the merchandise had been ordered. *See* Trial Transcript (Tr.) 120.

In these circumstances, Pottinger's credibility was crucial to the outcome of the case. If the jury believed Pottinger, Gambler would be found guilty. Accordingly, Gambler's counsel made clear to the trial court at a pretrial hearing that he would seek to introduce evidence that Pottinger was improperly motivated in testifying.[3]

7. We find *Wynn v. United States*, 397 F.2d 621 (D.C.Cir.1967), distinguishable on its facts. There this court reversed a conviction because of the failure of the trial court to allow testimony by the defendant on a quarrel that had allegedly taken place between him and the Government's star witness. The Government witness had previously denied the existence of the quarrel on cross-examination. The case at hand is different in that cross-examination on this witness's pecuniary interest did take place and the probative force of the testimony excluded here is demonstrably less (in *Wynn*, the Government witness had allegedly threatened to "get even" with the defendant). Furthermore, the *basis* of this "quarrel" between Pottinger and Gambler was clearly placed before the jury.

1. The discussion that follows concentrates on counts one and two of the indictment, charging

wire fraud and false pretenses; for these counts, the pivotal factual issue is whether Gambler made a false representation to Pottinger about the ordering of the merchandise before receiving the last check in January 1979. Counts three and four, charging larceny after trust from Pottinger, also depend heavily on Pottinger's characterization of his dealings with Gambler.

2. The prosecution also called as a rebuttal witness a business consultant who had already testified for the defense; she had no personal knowledge of the dealings between Pottinger and Gambler.

3. Counsel stated at that hearing:
 I am going to try to do everything I can to show bias, malice, and motive on the part of Mr. Pottinger from the time in early May when he was talking about suing this man,

For that purpose, counsel attempted to question Pottinger about his $109,000 lawsuit, in order to demonstrate to the jury "his antagonism and animosity toward Mr. Gambler, [which] bear on the issue of his bias in connection with his testimony." Tr. 110.

Evidence of this character has long been regarded as highly probative in impeaching a complaining witness, and its exclusion has routinely been considered reversible error. Nonetheless, the trial court forbade this line of questioning, believing that its probative force was outweighed by the confusion likely to result if the court was forced to explain to the jury how Pottinger's lawsuit became intertwined with Gambler's bankruptcy. Tr. 105. The majority opinion acknowledges that this ruling was legal error, and I cannot support its attempts to rescue the trial court's ruling by invoking the harmless error doctrine and by speculating about how the trial court might have exercised its discretion after permitting counsel to ask his first question. Accordingly, I believe that Gambler's conviction on the Pottinger counts must be reversed.

## I. IMPEACHMENT OF A WITNESS FOR BIAS

As the majority opinion recognizes, it has long been held reversible error for a trial

court to prevent a defendant from establishing on cross-examination that a damaging witness is his adversary in other litigation. Cross-examination is, of course, fundamental to the Anglo-American system of adversary litigation. The right to challenge the testimony of an opposing witness, and to put questions calculated to expose inaccuracy or fabrication, is guaranteed in criminal trials by the Confrontation Clause of the Sixth Amendment.[4] To the present day, cross-examination has continually been praised as "beyond any doubt the greatest legal engine ever invented for the discovery of truth."[5]

One major function of cross-examination is to undermine the witness' credibility by demonstrating his motivation to distort his testimony in order to harm the defendant. "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (quoting 3A J. Wigmore, Evidence § 940, at 775 (Chadbourn rev. 1970)); *see Villaroman v. United States*, 184 F.2d 261, 262 (D.C. Cir. 1950) ("Bias of a witness is always relevant.").

Because the opinions in this area frequently are so terse, and because they usually rely so heavily on Wigmore,[6] it is in-

not only getting criminal charges brought against him, but suing him for the full $17,-000 even though it is clear that part of that money wasn't for furniture.

On top of that suing him for another $1,700 [sic] for Mr. Pottinger's time at $100 an hour that he spent picking out furniture from Mr. Gambler. Suing him for another umpteen thousand dollars because he couldn't have parties at his home because his furniture hadn't come.

Just because that man is a former assistant attorney general, a respected member of the Bar, doesn't mean he cannot be biased, that his memory can't be faulty, that he can't be motivated improperly.

Pretrial Transcript, May 6, 1980, 40–41.

4. *See Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The right to cross-examine is also guaranteed in some civil contexts by the Due Process Clauses of the Fifth and Fourteenth Amendments, *see id.* at 317 n.4, 94 S.Ct. at 1110 n.4; *Goldberg v. Kelly*,

397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *but see, e. g., Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Since this case comes to us on appeal from a federal criminal conviction, it is unnecessary to reach the question of the required constitutional minimum; the trial court's ruling should be reversed as an abuse of discretion under the federal law of evidence.

5. *Watkins v. Sowders*, 449 U.S. 341, 349 n.4, 101 S.Ct. 654, 659 n.4, 66 L.Ed.2d 549 (1981) (Stewart, J.) (quoting 5 J. Wigmore, Evidence § 1367, at 32 (Chadbourn rev. 1974)).

6. A few reservations are pertinent concerning the case law and its use of Wigmore's scholarship. First, we are dealing with more than a century of holdings from a broad spectrum of American jurisdictions; we cannot hope for a completely coherent and consistent body of

structive to set out Wigmore's general framework for analyzing the partiality of a witness:

> Three different *kinds of emotion* constituting untrustworthy partiality may be broadly distinguished—bias, interest, and corruption:
>
> *Bias*, in common acceptance, covers all varieties of hostility or prejudice against the opponent *personally* or of favor to the proponent personally.
>
> *Interest* signifies the specific inclination which is apt to be produced by the relation between the witness and the *cause at issue* in the litigation.
>
> *Corruption* is here to be understood as the *conscious false intent* which is inferrible from giving or taking a bribe or from expressions of a general unscrupulousness for the case in hand.
>
> The kinds of evidence available are two:
>
> (a) The *circumstances of the witness' situation*, making it "a priori" probable that he has some partiality of emotion for one party's cause;
>
> (b) The *conduct of the witness* himself, indicating the presence of such partiality, the inference here being from the expression of the feeling to the feeling itself.

These two sorts correspond to two of the three generic sorts of all circumstantial evidence (§ 43 *supra*)—prospectant and retrospectant.

3A J. Wigmore, Evidence § 945, at 782–83 (Chadbourn rev. 1970) [hereinafter cited as Wigmore] (emphasis in original, footnote omitted).

Bias and interest have differing histories. At common law,[7] parties and other persons with an "interest" in the outcome of civil litigation were incompetent to appear as witnesses in that litigation; the rule was less strictly applied to persons who might be considered "interested" in the successful prosecution of a criminal case.[8] This disqualification did not extend to witnesses merely *biased* against a party, but bias has always been regarded as so critical to a witness' credibility that broad scope must be given to the inquiry. Courts are " 'very liberal in accepting testimony relevant to a showing of bias,' "[9] and a witness' denial of bias can be contradicted by extrinsic evidence, including calling of further witnesses.[10]

Three reasons are commonly given for allowing impeachment of one party's witness through evidence of his litigation against the opposing party.[11] The first is

---

precedent. California, for example, apparently retains a minority view that evidence of a civil suit need not be admitted. *See, e. g., People v. Philpott*, 201 Cal.App.2d 859, 20 Cal.Rptr. 540 (1962). Second, many of the opinions are exceedingly laconic in their treatment of the evidentiary question. Third, numerous cases cite Wigmore for the proposition that the evidence should be admitted, and then reverse the trial court. This course is not entirely in the spirit of Dean Wigmore's own approach to judicial administration which characteristically stressed flexibility in case-by-case adjudication and appellate deference to the discretion of the trial court on evidentiary matters. *See, e. g.*, 3A Wigmore § 949, at 791–92; 1 Wigmore § 8a, at 259–60. Wigmore's aim in discussing impeachment by bias is to demonstrate the admissibility of evidence, not to categorize abuses of discretion by trial courts. Nonetheless, the tradition in this jurisdiction and in others has been to allude to Wigmore while reversing the trial court—where appellate courts have come to regard certain methods of cross-examination as a defendant's right, trial court discretion is circumscribed.

7. "At common law" is, as always, an elusive characterization; Wigmore states that disqualification of nonparty witnesses for interest was not the rule until the early seventeenth century, 2 Wigmore § 575. Scathingly criticized by Bentham, the rules of disqualification were gradually abrogated by statute in England between 1843 (Lord Denham's Act, re non-parties) and 1851 (Lord Brougham's Act, re parties); most American jurisdictions followed this lead soon after. *Id.* §§ 576–77, at 816–19.

8. *Id.* § 966; 2 Wigmore § 575; *id.* at 808.

9. *United States v. Robinson*, 530 F.2d 1076, 1079 (D.C.Cir.1976) (quoting 3 Weinstein's Evidence ¶ 607 [03] at 607–17 (1975)).

10. *Id.; Wynn v. United States*, 397 F.2d 621 (D.C.Cir.1967); 3A Wigmore § 948, at 783.

11. An entirely different situation is presented by those cases in which prior litigation is thought to prejudice a witness in *favor* of his former opponent, usually due to a generous

interest: where the outcome of the cause at issue may affect the witness' recovery in parallel litigation, the pecuniary interest may motivate the witness to distort his testimony.[12] This rationale is usually applied to pending or contemplated litigation arising out of the same facts as the case at bar.[13]

A second and broader rationale is based on a view of litigation as an occurrence likely to breed hostility between opposing parties. Like the inference from interest in a related suit, this theory relies on a "prospectant" deduction of partiality from circumstances likely to cause it. This second rationale goes beyond the first, however, and justifies an inference of partiality on the basis of litigation that is wholly unrelated to the case at bar.[14] Since the possibility of future benefit does not motivate the witness' conduct under this rationale, it would be irrelevant that the other litigation is already completed,[15] though presumably the passage of time could decrease the likelihood of lingering hostility.

The third rationale applies only where the other litigation between the witness and the adverse party is instigated by the witness himself. In that case, the bringing of the suit is "relevant, not only as a circumstance tending to create feeling, but also as involving conduct expressive of feeling," [16] Wigmore's "retrospectant" evidence.[17] This

settlement. *See, e. g., Joice v. Missouri-Kansas-Texas R.R.*, 354 Mo. 439, 189 S.W.2d 568 (1945).

**12.** Given the modern possibility of using collateral estoppel offensively in the absence of mutuality, *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the source of a witness' pecuniary interest will often be clear. Even before this development, some jurisdictions permitted introduction of a prior adjudication as evidence of the underlying facts, particularly where the former judgment was a criminal conviction. *See* cases collected in 4 Wigmore § 1346a n.1. Where the current judgment would not be admissible as evidence of liability in the second proceeding, courts have found sufficient "interest" in the usefulness of a conviction in impeaching the defendant if he testifies in the civil suit, *e. g., State v. Hart*, 239 N.C. 709, 80 S.E.2d 901 (1954), or in the witness' need to avoid inconsistent statements that would damage him at his civil trial, *State v. Kellogg*, 350 So.2d 656 (La.1977).

**13.** *See, e. g., State v. Kellogg*, 350 So.2d 656 (La.1977) (pending suit); *State v. Underwood*, 281 N.W.2d 337 (Minn.1979) (contemplated suit).

**14.** *See, e. g., State v. Pigques*, 310 S.W.2d 942 (Mo.1958) (defendant's wage claim against employer-witness evidence of animus in burglary trial); 3A Wigmore § 949, at 788.

**15.** *See, e. g., North Greenville College v. Sherman Construction Co.*, 270 S.C. 553, 243 S.E.2d 441 (1978) (arbitrators' award in favor of college against architect-witness).

**16.** 3A Wigmore § 949, at 788 (footnote omitted); *see United States v. Cohen*, 163 F.2d 667 (3d Cir. 1947).

**17.** Where the same subject matter is involved, a minority view has rejected the claim that this evidence of bias is of sufficient weight to render its exclusion error:

> The testimony of the complaining witness tended to show that she had claims against appellant upon which she might have maintained a civil action, and we think the mere fact that she had commenced such an action would have added nothing, for the purpose of showing her bias, to the fact that such a claim existed, and to the further fact that she was at the time actually testifying in a criminal case against appellant as the complaining witness, concerning the identical transactions out of which the claim arose.

*People v. Murray*, 87 Cal.App. 145, 261 P. 740, 742 (1927). Some of the courts that adhere to the majority rule that exclusion is error disagree with the factual premise of this argument, and recognize initiation of a lawsuit as evidence of bad feeling beyond the mere appearance as a complaining witness. *E. g., United States v. Cohen*, 163 F.2d 667, 669 (3d Cir. 1947) ("We think the fact, if it was a fact, that Straw had instituted a civil action against the appellant based upon the same transaction charged in the information would have a direct bearing on the credibility of Straw, to show bias and prejudice, as well as his relation to the case."). Others, while agreeing that the inference may often be weak, regard the weight of the impeaching evidence as a question for the jury:

> We understand, and are in sympathy with, the apparent logic that rejects the notion that the jury is apt to infer any different or greater degree of bias on the part of the victim because of his institution of a civil action than that which the jury would infer as a material incident of the victim's injuries suffered at the hands of the defendant. But this approach to the problem begs the question.

principle would also apply regardless of whether or not the suit reflected the same subject matter as the current proceeding, and whether or not the suit was still pending.[18]

Under the framework just sketched it is true, as the majority concludes, that this court's prior holding in *Villaroman* is not necessarily controlling in the present case. On its facts, of course, *Villaroman* dealt with a pending damage suit that paralleled an assault prosecution, and so the question of litigation that has already been settled was not before the court. Moreover, the court's brief discussion of admissibility involved an inseparable fusion of the "bias" and "interest" approaches, and cited cases based on either rationale or both.[19]

As the majority acknowledges, any ambiguity in this court's prior approach should be resolved in favor of admitting impeachment evidence on the bias rationale. As Wigmore and courts in numerous jurisdictions have recognized, litigation is both an exercise tending to breed hostility and a combat often born of hostility. Our culture offers various other methods, of varying efficacy, for resolving disputes, and the jury is entitled to consider whether in a given case resort to the courts suggests a level of emotional intensity that might prevent the litigant from dispassionately narrating the origins of the dispute. The fact that the litigation is no longer pending does not destroy the inference of hostility.[20] The analogy of a stubborn public quarrel is an apt one; under our own precedents, quarrels need not be ongoing at the time of trial to provide a proper source of impeaching evidence.[21]

I turn, then, to the nub of my disagreement with the majority opinion, the suggestion that on the facts of this case the error was harmless and that therefore no new trial is necessary. I believe this conclusion is wrong on two independent grounds: it is incorrect on the facts, and it relies upon an unfounded assumption about how the district court would exercise its discretion in limiting further evidence of the witness' bias.

## II. PREJUDICIAL ERROR

### A. *Pottinger's Testimony*

J. Stanley Pottinger emerges from the transcript of the trial as a very impressive witness. The prosecution lost no time in informing the jury of his credentials:

Q Would you please give us your full name?

---

18. *See People v. Field*, 290 Mich. 173, 287 N.W. 422 (1939) (civil suit against defendant-embezzler's securities firm settled before criminal trial; concurring opinion cites "recrimination and revenge" as relevant motives).

19. *E. g., United States v. Cohen*, 163 F.2d 667 (3d Cir. 1947) (pending suit; both); *People v. Field*, 290 Mich. 173, 287 N.W. 422 (1939) (settled suit; bias); *State v. Decker*, 161 Mo.App. 396, 143 S.W. 544 (1912) (contemplated suit; interest).

20. *See North Greenville College v. Sherman Construction Cő.*, 270 S.C. 553, 243 S.E.2d 441 (1978); *People v. Field*, 290 Mich. 173, 287 N.W. 422 (1939).

21. *See Wynn v. United States*, 397 F.2d 621, 624 (D.C.Cir.1967) (reversing conviction due to exclusion of quarrel on unrelated subject; dispute "not as a matter of law so remote in time as to lack materiality").

The pertinent inquiry is: Within whose prerogative does this determination lie? *In re Brooks*, 393 So.2d 486, 487 (Ala.1980). At the risk of violating Wigmore's prescription that "it is useless to attempt to distinguish and refine" these cases, 3A Wigmore § 949, at 788, it may be suggested that bias is less easily inferred from a civil suit for compensation where the complaining witness has indisputably suffered an atrocious physical injury at the hands of a stranger and the identity of the assailant is the controverted issue; where the witness prompts simultaneous civil and criminal proceedings against an acquaintance and the legality of the defendant's conduct depends on the witness' report of his actions, the litigation may be more relevant to motivation. *Compare Villaroman v. United States*, 184 F.2d 261 (D.C.Cir.1950) (self-defense in assault case); *United States v. Cohen*, 163 F.2d 667 (3d Cir. 1947) (agreement to sell auto over legal ceiling price), *and People v. Field*, 290 Mich. 173, 287 N.W. 422 (1939) (embezzlement by securities dealer), *with People v. Jones*, 70 Ill. App.3d 338, 26 Ill.Dec. 180, 387 N.E.2d 1010 (1979) (rape and attempted murder).

A J. Stanley Pottinger.

Q Where are you employed at the present time?

A With the law firm of Troy, Mallen and Pottinger, Washington, D.C.

Q What did you do prior to that?

A I was an Assistant Attorney General of the Civil Rights Division in the Department of Justice.

Tr. 3. As Pottinger pointed out in his testimony, even while pressuring Gambler for the return of his money he scrupulously observed the ethics of his profession:

> He said that he had sold 2 of his sconces already for $1500 to a woman client of his in New York and was ready to send that check to me right away and he asked me how he should do it, should he simply endorse her check over to me or should [he] put it in his account and write a check on his account to me. I said it didn't make any difference to me, but we were in an adversary position at that time and if there were any implications about the best way to proceed, he should ask someone other than me. He was asking me as a lawyer on that point.

Tr. 43.

Pottinger also portrayed himself as sympathetic and understanding in his dealings with Gambler once he discovered that Gambler had been evading him, and had not ordered his furniture.

> I said, Grant, isn't it true that you really didn't order the furniture at all, and he said, no, that is not true, I did order it. I pressed him again on the point, I said Grant, if you are honest with me, we can work out the problem, whatever it is. If you are sick, broke or whatever the problem is, tell me what happened and we'll work it out, we are months overdue, we had all these stories and it should be obvious to you, as me, it had not been ordered and he said, I can't remember, I can't remember, I am feeling bad and I can't remember what I did. I said Grant, just tell me the truth, you did not order it, did you? There was a long pause and he said no, I did not. He then said, what do you want and I said I would just like

my money back and I will pick it up from here and take care of it. I am sorry things have gone this way for you, but I would like to get my money back.

Tr. 40–41.

Against this background, Gambler's counsel had the unenviable task of attacking Pottinger's credibility, of convincing the jury that Pottinger had ulterior motives for remembering conversations the way he did and that despite appearances Pottinger was capable of yielding to this temptation. There was no written evidence of Gambler's false representations, and the difference between simple breach of contract and criminal fraud lay entirely in whether the jury believed Pottinger's explanation of the past dialogue between them.

Gambler's counsel tried two routes to accomplish this result. The court allowed him one of these: the argument that Pottinger was financially interested in the outcome of the case, because Gambler's conviction would assist Pottinger in deducting for income tax purposes any loss he incurred in their dealings. The trial court instructed the jury that this theory did make sense legally, and that, "[a]ccordingly, he does have a financial interest in the outcome and you may consider that fact in your consideration and weighing of his testimony just as you consider any interest anybody else may have in the outcome of this case weighing their testimony." Tr. 328.

Counsel's attempt to confront Pottinger with this theoretical interest was less successful. Pottinger responded on cross-examination as though he were unconcerned with the character of the deduction and unaware of the details:

Q Is it true, Mr. Pottinger, that your basis for claiming that deduction is on the basis that Mr. Gambler committed larceny, committed a crime in connection with the transaction?

A I am honestly not sure. It is my understanding, that it is in the nature of a bad debt that could be claimed whether he is convicted or not. In other words, because it is a bad debt

and perhaps a condition precedent to that is it is a bad debt through fraud. This was turned over to Tigar and Buffone, with whom you are familiar. The basis for that agreement was worked out, I believe, with agreement with yourself.

. . . .

Q It is not your claim, is it, that this was a loss incurred in your trade or business, is it?

A I don't know the answer to that. Carolyn Dye of my office, who is a tax attorney in my office, and Tigar and Buffone who handle the suit with your office, provided the memos and information to Beers and Cutler. It is my intention to the extent that the law permits, to take deductions for money I never got from Mr. Gambler, or part of it, not all bec[au]se he provided some service as I testified yesterday.

Tr. 119–20. This testimony did not provide dramatic support for the argument that Pottinger cared so much about his tax deduction that he would depart from the truth to secure it.

The most crucial ammunition in counsel's campaign to convince the jury that Pottinger might be induced to distort his testimony by the same influences that sway less respectable witnesses was the $100,000 damage suit. That litigation not only suggested the degree of Pottinger's hostility toward Gambler—it also specifically contradicted the picture Pottinger had painted of himself as a kind and forgiving victim who "would just like [his] money back." Counsel expressed his disappointment when that evidence was ruled inadmissible, Tr. 105, and announced for the record before closing argument that, because he had been deprived of that evidence, his address to the jury would be significantly different than he had planned:

> As a result of the Court's rulings I find myself in a position where I do not have the evidence before the jury to effectively challenge Mr. Pottinger's testimony with respect to it being biased, with respect to his animosity toward Mr. Gambler, and his motive to seek punishment in one form or another, whether financial or if not financial with criminal conviction. As a result my closing address to the jury would be significantly different than otherwise.

Supplemental Transcript, May 14, 1980, at S–19 to S–20. I believe that a reading of the record makes it clear that counsel was quite accurate in his assessment of the gap left in his case by the court's exclusion of the impeachment evidence. Gambler's defense was crippled by this ruling. This fact is especially clear when the ruling is viewed in the light of the full evidence of Pottinger's damage claims—and, as I shall explain, this court has no basis for assuming that the district court would have excluded that evidence once the basic fact that Pottinger had sued Gambler had been admitted. But even the admission of the mere fact that Pottinger had brought suit could have made a tremendous difference to Gambler's defense.

### B. *The Nature of the Lawsuit*

The most probative aspect of Pottinger's suit against Gambler is Pottinger's theory of damages. The total amount of money received by Gambler from Pottinger was $17,715.20.[22] Nonetheless, the amount claimed by Pottinger in his civil suit was more than six times that sum—$108,915.70. Pottinger viewed himself as entitled to compensation for 112 hours he had spent with Gambler shopping for his furnishings, and billed the time at $100 per hour, yielding $11,200. Pottinger claimed a further $30,000 as compensation for lost business opportunities caused by his inability to entertain professional acquaintances in his new home, and $50,000 for his pain and suffering.

---

**22.** The $17,715.20 figure includes both the $16,215.20 at issue in the indictment and a further sum that apparently constituted some kind of initial payment. Both figures surface at various points in the record.

Pottinger's lawsuit might be thought vindictive. If this evidence had been before the jury, it might have contradicted the impression of the witness as a sympathetic and objective victim recounting the events of his deception. Furthermore, as evidence of Pottinger's actual conduct in response to his dealings with Gambler, these facts might have led the jury to reject an assumption that this impressively respectable witness would be capable of rising above an $18,000 loss and testifying with objectivity.

The majority opinion brushes this evidence aside by speculating that the trial judge might have found some reason to exclude it:

> In attempting to explore the concluded litigation, defense counsel appeared most intent, at trial and in this court, upon having the jury learn of the *amount* of damages sought by the complainant in the three different contexts, perhaps to reflect the large measure of animosity allegedly possessed by the witness against the defendant. Were this information introduced, however, the prosecution might well have sought to reexamine Pottinger, and other lawyers employed by him, to establish the validity of the damages sought in the complaint. Balancing the questionable probative value of this amount as indicative of the witness' hostility versus the delay and confusion of the issues resulting from such an extended inquiry, the district court did not abuse its discretion in excluding this evidence. *See State v. Ballas,* 41 Conn.L.J. 47 (1980); *Brooks v. State,* 259 Ind. 678, 291 N.E.2d 559, 560 (1973).

Majority opinion at 838–839 (emphasis in original). But it is apparent from the record that the district court never exercised any discretion to exclude the evidence for such reasons. Rather, the district court excluded *all reference* to the lawsuit, in order to avoid confusing the jury with an explanation of Gambler's *bankruptcy* proceedings.[23] Once the fact of the lawsuit had been admitted, and any necessary discussion of the bankruptcy process had taken place, cross-examination concerning the nature of the lawsuit would not have created any need for further discussion of the bankruptcy. We have, therefore, no reason to believe that the district court would have sustained an objection to further questioning about Pottinger's lawsuit.

No one questions the trial court's considerable discretion to limit the extent of detail that counsel may elicit on cross-examination.[24] For precisely this reason, however, it is unrealistic to conjecture that once the magnitude of Pottinger's lawsuit was revealed, the district court would lose control over the progress of the trial, and that confusion and delay, including testimony by Pottinger's attorneys, would result. The trial court never expressed insecurity over its ability to manage this issue.[25]

Nor does the case law suggest that there would be any *impropriety* in asking a complaining witness the extent of the injury he has claimed in a civil suit. The majority opinion cites, and my own research has found, only cases declining to find an abuse of discretion in a trial court's limitation of cross-examination concerning damages.[26]

23. The record is unambiguous on this point:

THE COURT: Well, it has some relevance to any bias and to his credibility, but as I indicated at the outset, its relevance is outweighed by confusion of the issues, particularly now that we have to get into the question of bankruptcy, what happened to the bankruptcy proceeding, why it was discharged, and so on. All too far removed. I will sustain the objection.

May 12 Trial Transcript at 103. It is unnecessary to consider whether so involved an explanation of the bankruptcy process was required, since the majority agrees that, even if it was, the district court erred in its weighing.

24. *See, e. g., Wynn v. United States,* 397 F.2d 621, 624 (D.C.Cir.1967) ("The trial judge, of course, retains control over the testimonial scope.").

25. This is, nonetheless, the sole basis for the majority's conjecture that evidence of the damage claim would have been excluded. *See* majority opinion at 838–839 & n.4.

26. *See State v. Ballas,* 41 Conn.L.J. 47 (1980) (lower court's rulings "were within its discretion"); *Brooks v. State,* 259 Ind. 678, 291 N.E.2d 559, 560 (1973) ("we would not be free to substitute our judgment upon such a discre-

These cases provide no warrant for assuming that inquiry into damage claims will ordinarily be refused.

Rather, the limits of the inquiry will normally be set by common sense. "Without a knowledge of the details, we cannot well know the extent of the ill-feeling and the allowance to be made against the testimony." 3A Wigmore § 951, at 796. The surest indication of the "extent of the ill-feeling" in the present case is the extravagant assessment Pottinger made of the value of his own time and suffering. This evidence is available in the damage claim, and is duplicated nowhere else.[27] Accordingly, unless there is some good reason for excluding it, it should be admitted, and we have no reason to assume that the district court would have done otherwise.[28]

### C. The Fact of the Lawsuit

After relying on speculation to determine that the jury would never have learned of the peculiar nature of Pottinger's lawsuit, the majority goes on to conclude that the mere fact that suit had been brought would not have been sufficient to change the jury's evaluation of Pottinger's credibility. Even if the majority's conjecture that the trial court would have excluded evidence on the damage claims were proper, I believe it is mistaken in concluding "beyond a reasonable doubt, that no juror would have been swayed by whatever suggestions of hostility and consequent implications of bias might

have arisen from the knowledge that the witness had undertaken profitless civil litigation against the defendant on the matter in question," see majority opinion at 16. I would conclude that the prejudice resulting from the trial court's error was clear and substantial.

The majority states three factors indicating that the excluded evidence would not have had an impact on the jury. First, "the jury was fully aware that Pottinger had not received either any of the furnishings ordered or any return of the deposits placed with the defendant." Id. at 12. That is to say, the jury may not have known that Pottinger had brought a lawsuit, but it had facts from which it could conclude that Pottinger was entitled to bring one. But this is always the case when a complaining witness testifies about an injury that is both a criminal and a civil wrong. This argument for affirmance is precisely the rationale used by the California courts, which reject the *Villaroman* rule.[29] The assumption on which *Villaroman* is predicated is that the fact of litigation provides a stronger showing of interest and bias than merely describing the conduct on which litigation could be based.

Second, the majority relies on ambiguous references in the testimony of Pottinger and of Gambler himself that might have made the jury aware that Pottinger had brought some kind of suit against Gambler.

tionary matter"). *See also Kanatser v. Chrysler Corp.*, 199 F.2d 610 (10th Cir. 1952), *cert. denied*, 344 U.S. 921, 73 S.Ct. 388, 97 L.Ed. 710 (1953) ("we do not think the trial court abused its discretionary power"); *People v. Jones*, 70 Ill.App.3d 338, 26 Ill.Dec. 180, 387 N.E.2d 1010 (1979) (court "cannot find . . . a clear abuse of discretion").

In *Brooks*, where the issue was the possible *interest* (not *bias*) of the victim of the shooting because of a suit against the defendant's *employer* arising out of the incident, the court expressed doubt about the probative value of the damage claim in quantifying the witness' interest, but its holding was governed by the highly deferential standard of review. 291 N.E.2d at 560.

**27.** In *Kanatser v. Chrysler Corp.*, 199 F.2d 610 (10th Cir. 1952), *cert. denied*, 344 U.S. 921, 73 S.Ct. 388, 97 L.Ed. 710 (1953), the court found no abuse of discretion in the trial court's exclu-

sion of the amount of damages claimed by the plaintiff's sister in a related suit against the auto manufacturer, because the description of her physical injuries could be sufficient to demonstrate the extent of her interest once the fact that she had also sued the manufacturer was admitted. In the present case, the jury was not so fully apprised of the extent of Pottinger's perceived injury.

**28.** This preference for admissibility is faithful to the spirit of the Federal Rules of Evidence, which provide that "[a]ll relevant evidence is admissible, except as otherwise provided," and then that relevant evidence "may be excluded if its probative value is substantially outweighed." Fed.R.Evid. 402, 403. *See generally* 1 Weinstein's Evidence 403–7 to 403–15 (1975).

**29.** *See* note 17 *supra*.

These brief hints, set out in the margin below,[30] would surely escape all but the most attentive juror. Most significantly, Gambler's counsel was never allowed to emphasize these passing references to the jury, or to argue that an inference concerning Pottinger's credibility could be drawn from them. Nor was the jury instructed that any particular action of Pottinger's might be considered evidence of bias.[31] Under these circumstances, a pair of ambiguous references cannot be a substitute for the cross-examination to which the defendant was entitled.

Finally, the majority suggests that the trial court's correct ruling on impeachment by financial interest gave the defendant a sufficient basis for attacking Pottinger's credibility, so that the erroneous exclusion of further impeaching evidence was harmless. But counsel's attempt to demonstrate Pottinger's active *hostility* toward Gambler cannot be viewed as merely cumulative after he had demonstrated to the jury that Pottinger had a theoretical possibility of financial *interest* in the outcome of the case.[32] Counsel's difficult uphill battle in this prosecution was the attempt to convince the jury that Pottinger, despite his impressive credentials and demeanor, was nonetheless capable of yielding to the temptation to distort his memory of past events in order to make Gambler's conviction more certain. The fact that Pottinger also had a financial interest which might or might not affect his conduct would be of little help in showing that Pottinger could be swayed by ignoble motives.

This case is a far cry from *Harris v. United States*, 371 F.2d 365 (9th Cir. 1967),

---

**30.** The majority cites Tr. 119–20, already quoted in the text; this is a discussion of Pottinger's tax deduction, in which Pottinger speaks vaguely of the basis of his deduction and then explains that the matter "was turned over to Tigar and Buffone, *with whom you are familiar.* The basis for that agreement was worked out, I believe, *with agreement with yourself.*" Tr. 119 (emphasis added). Shortly thereafter, Pottinger states that "Carolyn Dye of my office, who is a tax attorney in my office, and Tigar and Buffone *who handle the suit with your office*, provided the memos and information to Beers and Cutler." *Id.* 119–20 (emphasis added). It is difficult to see how even the most alert juror could deduce from these remarks to Gambler's counsel that Pottinger had brought suit against Gambler, or even that Gambler was involved in "the suit with [his attorney's] office." The majority also cites Gambler's testimony, in which the following passage occurs:

Q Did Mr. Pottinger mention anything to you about criminal prosecution?
A Yes.
Q What did he say?
A At that point—
MR. MARCY—Excuse me. Is this on May 11th?
THE COURT: I think that is what we're talking about.
A At that point he indicated he was going ahead with a suit and you know, he mentioned that—I don't know exactly how he phrased it, but it was like, I'm going to go ahead with suit proceedings, if you can come up with the money, you know, I will drop it or whatever, something like that.
Q Am I correct, that you did thereafter receive suit papers from Mr. Pottinger?
MR. MARCY: Objection.

THE COURT: Sustained.
Q Did you, on approximately June 29—
MR. MARCY: Objection. May we approach the bench?
THE COURT: You may approach the bench but I think I will rule against you.
(At the bench)
MR. MARCY: Perhaps I misunderstood the ruling. None of the civil suit bankruptcy—
THE COURT: —Not the suit by the fact he declared bankruptcy. I indicated in voir dire the fact he was bankrupt could be brought in, not any of the civil suits or lib[el], slander, all of that. The fact he is bankrupt, has some bearing on his intent. Is that what you are trying get into?
MR. SCHULTZ: Yes.
MR. MARCY: As long as it is that question. Proof of claims and—
THE COURT: —That's all.
Tr. 240–41.

**31.** The court instructed the jury at length on the effect a witness' interest might have on his credibility, and explained the relevance of Pottinger's tax deduction. Tr. 327–28. The instruction on bias was general and brief: "If you find that a particular witness has shown himself to be biased or prejudiced against one side or the other, you may consider whether that bias or prejudic[e] has colored his testimony or her testimony as the case may be." Tr. 327.

**32.** The majority agrees that exclusion of the evidence of litigation was error, but because that litigation had long been settled, it could only have been used to demonstrate *bias*, not *interest*. Pottinger no longer stood to gain from the lawsuit itself.

which the majority cites at page 12 of its opinion. In *Harris*, the court noted that "the fulness of the record with regard to the [paid informant's] financial arrangements with the government" rendered harmless the trial court's error in excluding "how much he had been paid by the government between the date of the last offense charged (August 1965) and the date of the trial (November 9, 1965)." *Id.* at 366–67. Loss of that detail did not prevent Harris from vigorously attacking the informer's credibility on the basis of his interest, the same grounds he would have used if the evidence had been admitted. As Gambler's counsel stated, the trial court's ruling in the present case deprived him of an entirely distinct avenue of argument on credibility, and made his "closing address to the jury . . . significantly different than otherwise." The Fifth Circuit has soundly observed that "[w]hether the exclusion of particular impeaching evidence creates a substantial danger of prejudice . . . depends, at least in part, on the defendant's ability to make the same impeachment argument in the absence of the excluded evidence." [33] Under that test, cross-examination of Pottinger was prejudicially restricted.

Pottinger's credibility was hardly a minor issue in this trial. Courts have long recognized the special need for full cross-examination where the testimony of a "key" or "star" witness is involved.[34] Nor do I understand the majority to state that further cross-examination was unnecessary because "the unsavory character of the witness[ ] had been sufficiently established," as in *United States v. Hansen*, 583 F.2d 325, 332 (7th Cir.), *cert. denied*, 439 U.S. 912, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978).[35] Rather, its conclusion that the error was harmless appears to depend on its disparagement of the probative force of the excluded evidence. The jury would be entitled to reach such an assessment, but to assume that no reasonable juror could do otherwise would be a rejection of the principle of *Villaroman*.

## III. CONCLUSION

This opinion has necessarily been rather long, but its conclusion could be reached equally well by common sense notions of procedural fairness and the practicalities of human conduct. The complaining witness is injured, and invokes a prosecution. His testimony is crucial to determining whether the defendant's conduct was a civil breach of contract or a deliberate criminal fraud. The defendant should therefore be allowed to demonstrate the witness' hostility toward him, and the bringing of a vindictive lawsuit would be highly probative evidence that the witness' presence on the stand may be the result of something more than every man's duty to give evidence. When the witness' credentials and his articulate testimony combine to support his credibility, denial of the defendant's right will rarely be harmless. In these circumstances, merely pointing out that a conviction may affect the witness' tax deduction is not enough.

The essential defect in the analysis set out in the majority opinion is its artificial fragmentation of the impeaching evidence. *Villaroman* and numerous other cases teach that excluding evidence of a lawsuit brought by a complaining witness is reversible error; nevertheless, the majority treats this evidence as a shell of mere fact—the bringing of the civil suit—whose exclusion is technically erroneous but in no way prejudicial, plus a more substantial body—the content of the civil suit—which may have greater probative value but which this court should presume the trial judge would have excluded. This analysis reduces *Villaroman* to an anomalous technicality.

---

33. *United States v. Brown*, 634 F.2d 819, 825-26 (5th Cir. 1981) (further questions "would have been merely cumulative").

34. *See, e. g., Davis v. Alaska*, 415 U.S. 308, 317, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974) ("key elements in the State's case"); *United States v. Sampol*, 636 F.2d 621, 660 (D.C.Cir. 1980) ("star witness"); *Wynn v. United States*, 397 F.2d 621, 624 (D.C.Cir.1967) (same).

35. *See also United States v. Marzano*, 537 F.2d 257, 269 (7th Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977).

If the jury had seen reason to doubt whether Pottinger's testimony was worthy of belief, then Gambler would have been acquitted. The exclusion of evidence that could have so severely tested Pottinger's credibility in the jury's eyes is hardly harmless error.