**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**J. Robert WESTBO,**
**Defendant-Appellant.**

No. 77–1368.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted April 19, 1978.
Decided May 11, 1978.
Rehearing Denied June 28, 1978.

Arthur H. Bosworth, II, Bosworth & Slivka, Denver, Colo., for appellant.

Richard N. Stuckey, Asst. U. S. Atty., Denver, Colo. (Joseph Dolan, U. S. Atty., Denver, Colo., on the brief), for appellee.

Before SETH, Chief Judge, and HOLLOWAY and McKAY, Circuit Judges.

McKAY, Circuit Judge.

Defendant J. Robert Westbo was indicted on two counts of mail fraud (18 U.S.C. § 1341) and two counts of wire fraud (18 U.S.C. § 1343). He was acquitted of the mail fraud counts but was convicted of the two wire fraud counts after a jury trial. Defendant does not challenge the sufficiency of the evidence on appeal. He contends, however, that he failed to receive a fair trial because (1) the jury heard prejudicial evidence relating to an uncharged crime, and (2) the trial court refused to give the "good faith" instruction requested by defendant.

As president of three mortgage and management companies located in Bellevue, Washington, defendant was contacted by the Bankers Union Life Insurance Company (BULIC) of Denver, Colorado, in the fall of 1975. Defendant agreed to act as a broker for BULIC in finding a purchaser for a block of more than 100 mortgages held by BULIC. For his brokerage services he was to receive a commission of 1% of the $2.4 million sales price asked by BULIC. Defendant received from BULIC a $45,000 advance deposit which was to be refunded when the sale was completed.

BULIC was in poor financial condition at the time it contacted defendant, and had been under the direct supervision of the Colorado State Insurance Commissioner (Commissioner) since January 1975. BULIC needed to "book" the sale of these mortgages before the end of 1975 in order to achieve an acceptable surplus asset level and thereby escape the direct supervision of the Commissioner. Defendant was told to sell the mortgages before December 31, 1975.

During November and December 1975, defendant attempted to broker the block of mortgages and succeeded in obtaining a commitment to purchase from Missouri Savings and Loan for $2.4 million. Further negotiations on the sale aborted in late December 1975. When BULIC learned that the sale likely would not be completed in 1975, the president of BULIC pressed defendant to purchase the mortgages personally through one of his companies, Trans-Pacific Mortgage. Consequently, on December 29, 1975, defendant sent BULIC a formal letter of commitment to purchase the mortgages for $2.4 million. This letter guaranteed to BULIC that Trans-Pacific Mortgage would purchase the loans. On the basis of this commitment letter, BULIC represented to the Commissioner and BULIC's shareholders that the mortgages had been sold as of December 31, 1975.

It is questionable whether Trans-Pacific Mortgage could have generated the financing necessary to carry out its commitment. Defendant knew at the time he made the commitment, however, that Columbia Savings and Loan (Columbia) was in a financial position to purchase the entire block of mortgages, and was interested in doing so. Thus, it appears defendant made the personal commitment demanded by BULIC, knowing there was a reasonably good pros-

pect of quickly selling the mortgages to Columbia.

Immediately after making the commitment, defendant began negotiations with Columbia which ultimately resulted in a completed sale for $2.7 million. The mortgage notes and deeds of trust were assigned directly from BULIC to Columbia, title never passing to defendant. The purchase price was wired from Columbia's bank to defendant's bank on January 12, 1976, pursuant to instructions from BULIC. On the same day, defendant wired BULIC's asking price of $2.4 million to its bank, representing a profit to BULIC of $380,000—exactly what it expected to gain from the sale.

Defendant has admitted he kept the difference of about $331,000 and did not account to BULIC for the $45,000 advance deposit. Defendant subsequently sent BULIC a false closing statement and attempted to justify his retention of the full $331,000. When later confronted by BULIC, defendant admitted he had wrongfully retained the $45,000 deposit. He also admitted having wrongfully deducted and retained from the $2.7 million sales price a $60,000 investor's fee, which was never actually charged by Columbia, a $70,445 fictitious servicing fee, and a $127,000 fee for advance mortgage insurance premiums which he never remitted. Without claiming any legal right to these fees, defendant later paid to BULIC the $45,000 and $60,000 amounts and admitted his liability to BULIC for another $163,000.

As a result of this and other business ventures, defendant's three companies were later placed under the direction of a trustee in bankruptcy who has controlled these companies during this trial. The electronic transfers of $2.7 million from Columbia's Denver bank to defendant's Seattle bank and of $2.4 million back to BULIC's Denver bank constituted the thin wire on which federal jurisdiction is based.

FAILURE TO GIVE DEFENDANT'S PROFFERED GOOD FAITH INSTRUCTION

Defendant claims he was entitled to a "good faith" instruction even if the jury found him to be acting as an agent, if they found that he thought and believed he became a principal upon the sending of his December 29, 1975 letter of commitment to BULIC. Even a cursory reading of defendant's proffered instruction shows that his argument on appeal goes far beyond the language of the instruction he claims was erroneously omitted. The rejected instruction stated:

> You are further instructed that good faith on the part of a defendant is a defense to a charge of mail and wire fraud, *that is, if a defendant did not act with knowledge of falsity and with intent* to *defraud,* then you must find him not guilty. You are further instructed however, that *no matter how firmly the defendant may believe in the plan, his belief will not justify* baseless, false, or reckless representations or promises knowingly and willfully made. (emphasis added).

Record, vol. 1, at 20. The instruction does not define good faith in terms of what defendant thought or believed; contrariwise, the instruction explicitly provides that no amount of subjective belief in his plan would "justify baseless, false, or reckless representations or promises knowingly and willfully made." Rather than considering what defendant could or should have offered as an instruction, our review will therefore be limited to an examination of the actual instruction omitted.

■■ Good faith is a defense to charges of mail or wire fraud. *United States v. Beitscher,* 467 F.2d 269, 273 (10th Cir. 1972); *Beck v. United States,* 305 F.2d 595, 599 (10th Cir.), *cert. denied* 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123 (1962). We recognize that "defendant's theory of the case should be presented so long as it states the law accurately and does not appear confusing to the jury." *United States v. Hall,* 536 F.2d 313, 330 (10th Cir.), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976), and cases cited. Thus, a defendant is entitled to an instruction covering good faith in mail and wire fraud cases where the evi-

dence supports it. *Sparrow v. United States,* 402 F.2d 826, 828 (10th Cir. 1968).

▮▮ The sufficiency of instructions is not determined by giving or failing to give particular instructions, but rather by viewing all of the instructions as a whole. *United States v. Pepe,* 501 F.2d 1142, 1144 (10th Cir. 1974); *United States v. Beitscher,* 467 F.2d at 273; *Beck v. United States,* 305 F.2d at 599. Moreover, it is well established that "even when charging the jury as to the defendant's theory of the case, the exact language offered by the defendant need not be followed." *United States v. Hall,* 536 F.2d at 330; *see Elbel v. United States,* 364 F.2d 127, 134 (10th Cir. 1966), *cert. denied,* 385 U.S. 1014, 87 S.Ct. 726, 17 L.Ed.2d 550 (1967).

▮ Applying the above rules to the facts of this case, we hold that the instructions given were sufficient and comprehensive. They correctly stated the law with respect to defendant's state of mind, which is an essential element of the offense charged. We note that good faith is the obverse of bad motive or intent to defraud. Indeed, some courts have treated issues of good faith and intent to defraud as synonymous. *E. g., United States v. Foshee,* 569 F.2d 401, 404 n. 3, 405 (5th Cir. 1978). It is clear in this case that the trial court's actual instructions on specific intent and principal-agent adequately covered the same concepts embodied in defendant's particular proffered instruction.

The rejected instruction explained that "good faith" means "a defendant did not act with knowledge of falsity and with intent to defraud." The instruction actually given explained that "intent to defraud" means "to act willfully and with specific intent to cheat or deceive." The court in turn instructed that

> [a]n act is done willfully if it is done voluntarily and intentionally and with some specific intent to do something which the law forbids, that is to say with bad purpose either to disobey or disregard the law, and to act knowingly is to act voluntarily and intentionally and not

as a result of mistake or inadvertence or accident *or other innocent reason.* (emphasis added).

Record, vol. 5, at 94. The court also emphasized that "specific intent must be proved before there can be a conviction," and explained that "[a] person who knowingly does an act which the law forbids intending with bad purpose either to disobey or disregard the law, may be found to act with specific intent." *Id.* at 94–95.

▮ The above instructions on intent to defraud were immediately followed with principal-agent instructions. With these instructions, read together with the next preceding instructions on intent to defraud, the jury possessed the legal concepts necessary to decide defendant's state of mind. Although the words "good faith" were not used, the instructions actually given contain the same legal concepts embodied in defendant's proffered definition of "good faith." We believe that the instructions, taken as a whole, adequately and sufficiently advised the jury about defendant's good-faith-principal theory of defense. We find no error in them. A defendant has no right "to have any instruction on the good faith issue given in the particular form he desired, or with any special emphasis." *United States v. Rothman,* 567 F.2d 744, 752 (7th Cir. 1977).

## ATTEMPTED INTRODUCTION OF EVIDENCE CONCERNING A SEPARATE, UNCHARGED CRIME

In defendant's motion for a mistrial and motion for a new trial he ascribed as error the government's attempted introduction of evidence concerning a separate, uncharged crime of forgery. In response, the government argued that the challenged line of questioning was necessary to fulfill the foundation requirements if this evidence was possibly to be admissible at some point other than in its case-in-chief. It is further suggested that had the trial court allowed this evidence to be presented to the jury no error would have resulted because it was

admissible evidence tending to show intent, plan, scheme or absence of mistake.

On the second day of trial the government proffered to the court, out of the presence of the jury, that new evidence had just come to light accidentally the day before. The Assistant United States Attorney stated that it amounted to evidence of misconduct, not charged, in giving false information to a bank in Seattle in the form of a forged or fraudulent commitment letter. The practical value of this letter to the government's case would have been to show that as early as October 1975 defendant Westbo was taking advantage of the hectic situation at Banker's Union Life Insurance Co. and that he somehow forged the document which he later used in Seattle to gain credit in a transaction unrelated to the one in this case. The evidentiary issue, in the government's view, was whether evidence of this forgery was admissible as other misconduct to prove a common plan, scheme or design, or intent or knowledge.

Defendant strenuously objected at the evidentiary conference to any mention of the alleged forgery, including an objection to its use even if defendant Westbo took the stand and put his credibility in issue. At that point, the defense's objection was that the government had not investigated this allegation and that even if the facts asserted by the government were true, which defendant disputed, there was no similarity between the two crimes which would tend to prove common plan, scheme or design, or intent.

At the close of this conference, before any of this newly discovered evidence was before the jury, the trial court ruled that it would not permit these allegations to be used as substantive evidence to be presented by the government in its case-in-chief. This ruling was somewhat qualified by the trial court stating that

> [i]t may be that you may be able to use what you have just disclosed here in cross-examination, either the defendant if he takes the stand, or maybe some other witnesses.

> I do not go as far as counsel for the defendant does that you can't even mention it . . . .

Record, vol. 4, at 15.

Following the testimony of one witness after the trial court had made this ruling, the prosecution recalled Irvin Matson, the vice president of Rainier National Bank in Seattle, Washington, who the day before had identified records of defendant's various corporate bank accounts. Matson was questioned on whether he had been subpoenaed that morning or the evening before to bring additional material to court. The ensuing testimony emphasized that a commitment letter from BULIC had been retrieved from Rainier National Bank's files, flow down to Denver air express, and picked up by someone from the FBI to be delivered to this witness. Later that day in the course of the trial, Jack Lewis, the vice president and secretary of BULIC, was called by the government to testify. After identifying several letters he had signed, the government showed the witness exhibit 207, the challenged commitment letter from Banker's Union Life Insurance Co. Lewis was asked if his signature was at the bottom of the front page. He responded that it was a copy of his signature but that he had never seen the letter before. At that point, the government asked Lewis what his present reaction to the letter was. Lewis answered

> [m]y reaction is someone has copied my signature very well or transposed it some way. To my knowledge I have never signed a document like this.

Record, vol. 4, at 100. As defense counsel then began to move for a mistrial, the government stated that it would cease questioning on this point. Counsel approached the bench and defendant moved for a mistrial arguing that there was only one conclusion that the jury could make at that point, and that was that the defendant placed the signature on the commitment letter himself. In denying the motion for mistrial the trial court stated, first, that the letter was not in evidence. Emphasizing that the evidence was still inadmissible, the court then advised counsel for the govern-

ment that it would have been better if he had advised the court of what he was proposing to do through that witness so that the question could have been asked outside of the presence of the jury. However, the trial court's belief that this particular testimony had not been prejudicial to defendant is indicated by the judge's comment that he didn't think it was of sufficient gravity to grant the motion for mistrial.

At one other point later in the trial, in cross-examining defendant Westbo, the government again began to elicit testimony regarding the allegedly forged commitment letter. Again defendant timely objected on the basis of the prejudicial effect of this evidence. Reiterating its concern with admitting this evidence, the trial court held that it would not let the government get into this matter unless the government could establish by competent evidence that defendant either forged the signature or caused it to be forged.

The record clearly shows that the trial judge ruled at the conclusion of the conference regarding this new evidence that it would not be admissible in the government's case-in-chief against Westbo. Rule 403 of the Federal Rules of Evidence provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ..

And Rule 404(b) states that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The general rule, reflected in Rules 403 and 404 of the Federal Rules of Evidence, is that evidence of illegal activities other than those charged is ordinarily inadmissible. *See United States v. Nolan,* 551 F.2d 266 (10th Cir.), *cert. denied,* 904 U.S. 434, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977); *United States v. Burkhart,* 458 F.2d 201 (10th Cir. 1972). Even under the exception to this rule provided in Rule 404(b) for evidence of crimes which prove common plan, scheme, design, knowledge, intent or absence of mistake, the evidence is not admissible if its probative value is outweighed by its potential for prejudice. In holding that this new evidence could not be used in the government's case-in-chief and could be used, if at all, only in cross-examination of defendant or other witnesses, the trial court provided a clear-cut ruling that this evidence did not meet the exception in Rule 404(b). The district judge's focus in ruling this evidence inadmissible presumably was the highly prejudicial effect of such an insinuation of forgery and fraud. Here, the judge implicitly determined before any evidence was presented that the potential prejudice of this forgery testimony exceeded the probative value, if any, of the evidence. This is the balancing required by Rules 403 and 404 to exclude prejudicial evidence of a defendant's bad character which might naturally be inferred from other misconduct. *See United States v. Cook,* 557 F.2d 1149 (5th Cir. 1977). Evidence that Westbo had committed a forgery in prior fraudulent dealings with BULIC was inherently prejudicial. The district judge's ruling on the inadmissibility of this evidence was reaffirmed for a third time when he refused to permit the government even to cross-examine Westbo on the basis of the proffered evidence.

What followed the ruling that this evidence did not have the probative value to be admissible under Rule 404(b) is the source of the error we perceive in the instant case. As the facts set forth show, the government put on witnesses assertedly to identify and lay a foundation for later cross-examination and rebuttal use of the evidence of the forged commitment letter. Witness Lewis' testimony introduced evidence that his signature on the commitment letter was a xerox forgery. The jury could not escape the conclusion, after the question to Lewis regarding his response to seeing his signature on a letter he hadn't ever seen before, that defendant Westbo had forged

the letter from BULIC. The further inference, that Westbo had earlier dealt fraudulently with BULIC, could also have been drawn from the prosecution witnesses' challenged testimony. This was exactly the evidence that the government had been advised in advance it could not bring out in the case. In effect, then, the forbidden evidence was put before the jury by unavoidable inferences drawn from the answers given by these prosecution witnesses.

Compounding these prejudicial inferences was the fact that defendant was then in the dilemma of having evidence of other crimes effectively before the jury but being unable to negate these inferences without waiving his objection to this inadmissible evidence.

One further aspect of the presentation of this evidence is troublesome. Among the mass of documents offered or introduced in this case, special attention was drawn to plaintiff's exhibit 207 (the commitment letter) by Rainier National Bank Vice President Matson's testimony relating to how the letter was obtained for trial. His testimony that the letter was obtained at the last minute by a special subpoena, that the letter was shipped to Denver by air express, and that it was picked up by an FBI employee to be brought to the trial kept the document in the jury's focus.

We are convinced that the trial court's intention when this evidence was first revealed was to exclude it because it was highly prejudicial and not probative of the issues of scheme or intent. In calling witnesses Lewis and Matson and eliciting the testimony regarding the allegedly forged commitment letter, the government violated the clear intent of the court's ruling. This egregious conduct denied Westbo a fair opportunity to defend.

 Defendant's motion for mistrial and motion for new trial both asserted that the attempted introduction of this evidence was so prejudicial as to constitute plain and reversible error. The scope of our review of denials of such motions is whether the trial judge abused his discretion. In the instant case, the evidence of another crime or wrongdoing committed by Westbo was illegally before the jury following the testimony of witnesses Lewis and Matson in the government's case-in-chief. We hold that the trial court abused its discretion in not declaring a mistrial, and in not subsequently granting the motion for a new trial, when the jury was exposed to this evidence. Reversed and remanded as to the conviction of wire fraud for further proceedings consistent with this opinion.