**Gary D. TAYLOR, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 84SC409.**

Supreme Court of Colorado, En Banc.

June 23, 1986.

Rehearing Denied Aug. 25, 1986.

David F. Vela, Colorado State Public Defender, Judy Fried, Deputy State Public Defender, Denver, for petitioner.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., David Saine, Asst. Atty. Gen., Denver, for respondent.

VOLLACK, Justice.

We granted certiorari to review the court of appeals' unpublished opinion in *People v. Taylor*, No. 83CA0142 (September 6, 1984). The court of appeals affirmed the petitioner's conviction by a jury of first degree murder and violent crime. Petitioner maintains the evidence was insufficient to establish beyond a reasonable doubt that he was guilty of the charges, and further maintains the cumulative effect of prosecutorial misconduct denied him a fair trial. We affirm.

On April 20, 1982, Jeanne Taylor's body was found in Clear Creek canyon. The body was wrapped in a tarpaulin and covered by rocks. An autopsy revealed that the cause of death was a gunshot wound to the back of the head which occurred several months earlier. On May 4, 1982, the petitioner, Gary Taylor, was charged with the murder of his wife.

On November 10, 1981, the petitioner reported his wife missing. Prior to that time, the marriage between petitioner and his wife had encountered some difficulties. The victim had been depressed about her inability to have a child and had recently quit her job in hopes that the reduction in stress would aid her efforts to become pregnant. The petitioner and his wife had been discussing the possibility of divorce.

In September of 1981, Holly Sue Potthoff and her husband had stayed with the Taylors in their trailer for a brief period of time. Testimony revealed that petitioner and Holly had begun to have an affair. On November 8, 1981, the petitioner asked his wife for a divorce, stating that he would probably end up with Holly. On the evening of November 9, 1981, Holly called the petitioner and informed him that she had decided to leave her husband and inquired about moving in with the petitioner. The petitioner agreed to the arrangement and arranged to pick up Holly the following day. Holly testified at trial that when she inquired about his wife, the petitioner responded, "Don't worry about Jeannie; I'll take care of that." The following morning at 10:00 A.M., he picked up Holly and moved her and her child into the trailer.

According to the petitioner, he last saw his wife on November 9, 1981, at 6:30 A.M. when he left for work. A neighbor testified he saw Jeanne walking on the street around 7:00 P.M. that day. When his wife had not returned home by 11:00 P.M., petitioner started to become concerned. While testifying at trial, petitioner stated he drove to the church where he believed his wife had a meeting that evening, but found no one there. Petitioner testified he then checked some bars and also went around to

various hospitals in an attempt to locate his wife. He was concerned because of her ongoing depression. Petitioner's search was fruitless and at 4:30 A.M. on the morning of November 10, he picked up a co-worker and went to work.

At 6:00 A.M. that morning, he left work at a printing shop to file a missing person report with the police department. When making the report, petitioner represented that they were having no problems in their marriage and that things were going well between the two of them. Petitioner notified Jeanne Taylor's mother of her disappearance that same morning. Petitioner then telephoned a friend of his wife, Jeanne Munzberg, to see if she knew of his wife's whereabouts. His wife's mother, Betty Whinery, also telephoned a close friend of hers, Kay McLaughlin, and Ms. McLaughlin and the Munzbergs came over to Whinery's house. The Munzbergs and petitioner then drove around and attempted to locate Jeanne Taylor, to no avail.

It was later that morning that petitioner helped Holly move into the trailer with him. Petitioner and Holly spent the rest of the day in the trailer together, while answering phone calls from people concerned about the whereabouts of Jeanne. On Wednesday, November 11, Holly Sue Potthoff decided the arrangement wasn't going to work, and she moved back in with her husband. This upset the petitioner, but he took it very quietly and helped her to move back.

Petitioner made representations to Ms. McLaughlin that he had placed a missing person advertisement in one of the metropolitan newspapers. Ms. McLaughlin was unable to find the advertisement in the papers and inquired further of petitioner as to when the ad was run and what paper it was in. Petitioner later showed her a copy of an advertisement which was represented to be the one he ran in the newspapers. Subsequently, he revealed that the advertisement had never been run and had been made by petitioner at his place of employment. Petitioner also represented that he put a photograph of his missing wife and notice on the bulletin board at his mobile home complex, but when one of the witnesses went to look for it, it was not there.

Petitioner told the police that he had removed the battery cables from his wife's car, which was parked at the trailer so if she came home she would not be able to leave again. The police officers checked the battery of the car, and it was apparent from the corrosion on the cables that they had never been removed.

On December 27, the petitioner called his wife's mother to report that an unidentified male had called him and said he had seen petitioner's wife in a depressed state at a Christmas party. Petitioner did not get the name of the caller, nor did he get any other information about the whereabouts of his wife.

The victim's body was found wrapped in a black canvas tarpaulin and the victim's head was resting on a pillow with an embroidered pillowcase. There was jewelry on the body, including several gold chains, three rings, a watch, a bracelet and gold earrings. The deceased was found clothed in socks, sweater, and bluejeans. A search warrant for the petitioner's residence was subsequently issued and executed. The search produced another embroidered pillowcase which matched the one found with the body. Further, fibers found on the tarpaulin in which the body was wrapped and fibers on a rope used to tie the body were analyzed and, following a comparison with a carpet sample taken from the petitioner's residence, it was determined that they had the same microscopic characteristics and color dye as the carpeting in the petitioner's residence. The tarpaulin which had been wrapped around the victim's body was very similar to a tarpaulin used by the petitioner at his place of employment.

The head and shoulders of the victim's body were wrapped in a plastic bag. A similar plastic bag was recovered during the search of the petitioner's residence. A comparison of the plastic bags revealed they were the same color, thickness, size, and of the same chemical composition, which led to the conclusion that they could

have originated from a common source. The rope which was used to tie the body was tied in a marlin and hammock hitch knot, which a sheriff's department investigator testified are taught in the Coast Guard. Petitioner had served in the Coast Guard.

The petitioner made no further inquiries to the authorities as to the whereabouts of his wife after his initial reporting of the disappearance, and made inconsistent representations to other persons concerning his attempts to find his wife.

Based upon the foregoing evidence, the jury concluded that the petitioner was guilty of first degree murder and violent crime. Petitioner maintains the evidence was insufficient to establish beyond a reasonable doubt that he was guilty of these charges.

We note that challenges to the sufficiency of the evidence to support a criminal conviction require a reviewing court to determine whether the evidence, both direct and circumstantial, when viewed as a whole and in a light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crime beyond a reasonable doubt. *People v. Quick,* 713 P.2d 1282 (Colo.1986); *People v. Aalbu,* 696 P.2d 796 (Colo.1985); *People v. Gonzales,* 666 P.2d 123 (Colo.1983); *People v. Brassfield,* 652 P.2d 588 (Colo.1982); *People v. Bennett,* 183 Colo. 125, 515 P.2d 466 (1973). Applying the test to the evidence in this case, we conclude the record contains evidence of the circumstances surrounding the victim's death from which a reasonable person could conclude that the petitioner, after deliberation and with murderous intent, brought about the untimely demise of his wife. Evidence of the petitioner's involvement in an affair with another woman, his inconsistent representations concerning attempts to find his wife, and the physical evidence involved in the case, when viewed as a whole and in a light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable person that he was guilty of the crimes as charged. There was no evidence produced of sexual assault and no other motive, such as robbery, was apparent. The evidence produced by the autopsy indicated there had been no struggle and the victim was killed when she was reclining or otherwise not actively resisting an assault.

■ It is the jury which should decide the difficult questions of witness credibility and the weight to be given to conflicting items of evidence. *People v. Brassfield,* 652 P.2d at 592. Inconsistencies in the evidence are not uncommon to the adversary process which, of necessity, must rely upon the sometimes contradictory and often incomplete testimony of human observers in attempting to reconstruct the historical facts underlying an event. It is because issues of credibility and weight are difficult to resolve and yet essential to the ultimate issue of guilt or innocence that the law entrusts these matters to the collective and diverse experience and judgment of the jury. *People v. Brassfield,* 652 P.2d at 593. We conclude that the evidence, when viewed most favorably to the prosecution, establishes that petitioner was guilty. The totality of evidence was sufficient to permit the jury to conclude beyond a reasonable doubt that petitioner committed the premeditated murder of his wife and was also guilty of violent crime by the use of a firearm in committing that act.

■ Petitioner next maintains the cumulative effect of prosecutorial misconduct deprived him of a fair trial. He alleges statements made by the prosecutor during trial and closing argument improperly conveyed the impression to the jury that defense counsel was unethical in conducting the defense. The statements were not objected to when they were made. We note that when the alleged error consists of prosecutorial misconduct and was not preserved by contemporaneous objection, it will not be considered on appeal unless it was plain error affecting the substantial rights of the defendant. *People v. Constant,* 645 P.2d 843 (Colo.1982); *People v. Swanson,* 638 P.2d 45 (Colo.1981).

Having examined the record, we conclude there is no prosecutorial misconduct of such a level as to constitute plain error within the meaning of Crim.P. 52(b). Accordingly, we find no merit in petitioner's allegations of prosecutorial misconduct.

We conclude the evidence presented at trial was sufficient to establish that petitioner was guilty of first degree murder and violent crime, and further conclude there was not prosecutorial misconduct sufficient to constitute plain error. Accordingly, we affirm the conviction by the jury.

Judgment affirmed.