The PEOPLE of the State of Colorado, Petitioner,

v.

Russell Millard HAMPTON, Respondent.

No. 86SC254.

Supreme Court of Colorado, En Banc.

Nov. 30, 1987.

Rehearing Denied Jan. 11, 1988.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Curt P. Kriksciun, Asst. Atty. Gen., Appellate Section, Denver, for petitioner.

Mary G. Allen, Tegtmeier & Sears, P.C., Colorado Springs, for respondent.

MULLARKEY, Justice.

The defendant was convicted of first degree sexual assault and two habitual criminal counts. At trial, certain evidence was admitted concerning rape trauma syndrome. The court of appeals held that rape trauma syndrome evidence is *per se* inadmissible in sexual assault trials and reversed the defendant's conviction, remanding for a new trial. We granted certiorari and now decide that the testimony in question was admissible. We therefore reverse the decision of the court of appeals.

## I.

At trial the victim testified that she met the defendant at the bank where she was employed and he was a regular customer and that she agreed to go out on a date with him. After several drinks at a bar, the victim and the defendant returned to the victim's apartment. When the victim refused the defendant's sexual advances, he forced her onto her bed, punched her twice, striking her throat and her chin, and sexually assaulted her. After the defendant left, the victim immediately called her cousin and told her that the defendant had hurt her. Her cousin testified that the victim was hysterical on the evening of the assault, as well as when she saw her on the next morning, and that bruises and lumps were visible on her throat. The victim mentioned the incident to several other people without explicitly stating that she was raped.

The defendant continued to frequent the bank at which the victim worked for the next two to three months. A police officer who worked as a security guard at the bank noticed a change in the victim's personality and questioned the victim about it; in response, she told him she had been in a car accident. About this time, the defendant discontinued his trips to the bank. Upon further prodding during the next few weeks, the victim confided in the security guard that she had been raped. The security guard convinced her to report the crime and she did so that evening, 89 days after the assault.

Subsequent to the testimony of the victim and defense counsel's cross-examination of her, the People called Patricia Wyka, head of the Victim Services Unit of the Colorado Springs Police Department. She was qualified and accepted by the trial court as an expert in victimology. Wyka testified that she had bachelor's and master's degrees in psychology and had attended seminars and workshops regarding victimology and sexual assault. She further stated that she had worked with several hundred adult victims of sexual assaults and 700 to 800 child victims of sexual abuse over a nine year period. Wyka testified as to the different stages of emotional adjustment involved in rape trauma syndrome. She observed that rape victims' reactions to men usually change, that most rape victims wish to avoid or escape from the scene of a sexual assault and that a rape victim is less likely to report a rape when the assailant is someone with whom she is acquainted rather than a stranger. Wyka never examined the victim. Other witnesses called by the People testified concerning aspects of the victim's behavior after the assault which were consistent with the rape trauma syndrome symptoms described by Wyka.

Defense counsel challenged the testimony of Wyka prior to trial. The trial court ruled that because defense counsel had represented that the complainant's delay in reporting the assault would be the subject of serious attack at trial, expert testimony

explaining why such a delay might occur was admissible.[1] The trial court also dismissed defense counsel's arguments that the remainder of Wyka's testimony was unduly prejudicial.

Defense counsel originally indicated to the district attorney and the trial court that the only witness who would testify at trial in connection with an alibi defense would be the defendant, if he chose to take the stand. Following the conclusion of the People's case-in-chief, the defense notified the court and the People that it would be presenting several alibi witnesses other than the defendant. Several witnesses then testified that they were with the defendant on the evening in question.[2]

## II.

The term "rape trauma syndrome" is used to describe a recurring pattern of emotional distress in rape victims. Burgess and Holmstrom, *Rape Trauma Syndrome*, 131 Am.J.Psychiatry 981 (1974). The syndrome usually consists of a two-phase reaction: an acute phase, followed by a long term process of reorganization. Typical symptoms of the acute phase are a fear of physical violence and death and feelings ranging from humiliation and embarrassment to anger, revenge and self-blame. The second phase is characterized by a disorganization in lifestyle, a change in residence, dreams about violent acts, nightmares and other sleep disturbances, the development of fears and phobias related to the specific circumstances of the attack and sexual dysfunction. *Id.* In 1980, the psychiatric profession recognized post-traumatic stress disorder as an anxiety disorder in the basic text relied upon by the profession for diagnostic purposes. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 236, 308.30, 309.81 (3d ed. 1980); McCord, *The Admissibility of Expert Testimony Regarding Rape Trauma Syndrome in Rape Prosecutions*, 26 B.C.L. Rev. 1143, 1151–53 (1985). Rape trauma syndrome is regarded as the quintessential example of post-traumatic stress disorder. McCord, *supra*, at 1152; *see also* H. Kaplan & B. Sadock, *Modern Synopsis of Comprehensive Textbook of Psychiatry/IV* 335–36, 470 (1980) (many rape victims experience the symptoms of a post-traumatic stress disorder); American Psychiatric Association, *supra* (post-traumatic stress disorder may be caused by rape). Although other examples of post-traumatic stress disorder exist, the symptoms associated with rape trauma syndrome, e.g., sexual dysfunction and rape-related fears, are distinguishable from the general symptoms related to post-traumatic stress disorder. McCord, *supra*, at 1152–53.

## III.

Although this is a case of first impression in Colorado, other states have confronted the issue. The highest court of one state has ruled that rape trauma syndrome testimony is inadmissible in criminal trials. *See State v. Saldana*, 324 N.W.2d 227 (Minn.1982) (rape trauma syndrome testimony is of no help to the jury and produces extreme danger of unfair prejudice).

Other states have held that rape trauma syndrome testimony is admissible. *See State v. McQuillen*, 236 Kan. 161, 689 P.2d 822 (1984) (when consent is the defense in a prosecution for rape, qualified expert psychiatric testimony regarding the existence of rape trauma syndrome is relevant and admissible);[3] *State v. Marks*, 231 Kan.

---

**1.** Defense counsel did, in fact, cross-examine the victim as to the delay and repeatedly stressed its significance in his closing argument.

**2.** The defense presented three witnesses, Valerie Staggs, the defendant's sister, Carl Kent, who was living with Ms. Staggs, and Darlene Hampton, the defendant's wife, who all testified that they were with the defendant on August 9, 1983, the evening on which the People claimed the assault occurred. Kent testified that, while the defendant's trial was in progress, he was reviewing a contract with his attorney. The contract apparently triggered his memory concerning a business meeting he had with the defendant on the evening in question. Staggs and Hampton testified they were present during the meeting between Kent and the defendant. The defendant never testified.

**3.** In *McQuillen*, three justices concurred in the majority opinion, a fourth concurred in the result and three justices dissented to the rape trauma syndrome holding.

645, 647 P.2d 1292 (1982) (rape trauma syndrome is generally accepted in the psychiatric community to be a common reaction to sexual assault, is relevant when the defendant claims that the victim consented and does not invade the province of the jury); *State v. Liddell*, 685 P.2d 918 (Mont. 1984) (quoting *Marks* approvingly in holding such evidence admissible when consent is a defense); *State v. Huey*, 145 Ariz. 59, 699 P.2d 1290 (1985) (although the evidence in question was not rape trauma syndrome evidence, testimony concerning rape trauma syndrome is admissible when the defendant claims consent as a defense); *see also State v. Allewalt*, 308 Md. 89, 517 A.2d 741 (1986) (post-traumatic stress disorder testimony is admissible in a sexual assault trial); *Commonwealth v. Gallagher*, 353 Pa.Super. 426, 510 A.2d 735 (1986) (rape trauma syndrome testimony is admissible to explain why the complainant was able to identify the defendant four years after the assault, although she had been unable to do so only two weeks after the assault).

Still other states have decided the issue with unclear results. *See People v. Bledsoe*, 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291 (1984) (rape trauma syndrome testimony is inadmissible to prove that a rape occurred but evidence of emotional and psychological trauma after an alleged rape may be admissible); *People v. Pullins*, 145 Mich.App. 414, 378 N.W.2d 502 (1985) (testimony concerning rape trauma syndrome is not admissible to prove that a rape occurred and evidence of such a trauma is relevant but should not be presented with an aura of scientific reliability unless the *Frye*[4] test is met; the court, however, gives no opinion as to the propriety of rape trauma syndrome evidence when consent is raised as a defense); *State v. Taylor*, 663 S.W.2d 235 (Mo.1984) (expert testimony that the complaining witness suffered from

rape trauma syndrome and had been raped is inadmissible although expert could legitimately testify that the victim's symptoms are consistent with a traumatic experience or a stressful sexual experience); *State v. Ogle*, 668 S.W.2d 138 (Mo.App.) (expert testimony regarding the reactions of rape victims admissible where the expert did not state that the victim suffered from rape trauma syndrome or that she had been raped), *cert. denied*, 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 91 (1984).

In the instant case, the court of appeals held in *People v. Hampton*, 728 P.2d 345 (Colo.App.1986), that evidence of rape trauma syndrome does not meet the test for admission of expert scientific testimony developed in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).[5] The court reasoned that such evidence is inadmissible because rape trauma syndrome was developed for treatment rather than proof purposes and because the symptoms of rape trauma syndrome could result from other traumas. The court held that rape trauma syndrome evidence does not have sufficient indicia of reliability on the issue of whether a rape occurred and that such evidence is, therefore, *per se* inadmissible. Accordingly, the court reversed the conviction of the defendant and remanded the case to the trial court for a new trial.

### IV.

The People contend that the court of appeals erred in applying the *Frye* test to this case. We agree. The *Frye* court was concerned with the admission of the results of a systolic blood pressure deception test.[6] Generally, the *Frye* test is applied to novel scientific devices and processes involving the manipulation of physical evidence including lie detectors, experimental systems of blood typing, voiceprints, identification

---

**4.** *See infra* note 5 and accompanying text.

**5.** "[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014. Thus, the basic

standard of *Frye* is general acceptance in the relevant scientific community.

**6.** The systolic blood pressure deception test, apparently the precursor to polygraph testing, measured blood pressure in an attempt to determine when the subject was being untruthful.

of human bite marks, and microscopic analysis of gunshot residue. *In re Amber B.*, 191 Cal.App.3d 682, 236 Cal.Rptr. 623, 626 (1987). The sole case in which we have applied the *Frye* test held that evidence of polygraph test results and testimony of polygraph examiners are *per se* inadmissible. *People v. Anderson*, 637 P.2d 354 (Colo.1981). Recently, we held that trial courts must make an individualized inquiry in each case to determine whether the trial testimony of a witness who has been hypnotized will be sufficiently reliable to qualify for admission. *People v. Romero*, 745 P.2d 1003 (Colo.1987). In so doing, we did not utilize the *Frye* test and expressly overruled the court of appeals decision in *People v. Quintanar*, 659 P.2d 710 (Colo. App.1982), which relied upon *Frye* to adopt a *per se* rule of inadmissibility for such testimony. *Romero*, at 1015, n. 8. We recognize that the *Frye* test has been utilized by other jurisdictions in some rape trauma syndrome cases. When the evidence of rape trauma syndrome is limited as it is in this case, the majority of such jurisdictions has held that the evidence meets the *Frye* test and is admissible.[7]

■ The *Frye* test has been criticized on several different grounds. Weinstein's view is that adoption of the rules of evidence is tantamount to an abandonment of *Frye*'s general acceptance standard. 3 J. Weinstein & M. Berger, *Weinstein's Evidence* § 702[03]; *see* 3 D. Louisell & C. Mueller, *Federal Evidence*, § 382 (1979) (the *Frye* test is at odds with F.R.E. 702; continued refusal to accept the testimony of a qualified expert for this reason alone cannot be supported by any other provision of the rules). Other commentators have argued that the *Frye* test is appropriate for taking judicial notice of scientific facts, but

should not be used as a criterion for the admissibility of scientific evidence; any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion. K. Broun, G. Dix, E. Gellhorn, D. Kaye, R. Meisenholder, E. Roberts, & J. Strong, *McCormick on Evidence* (3rd ed. 1984); *see also* J. Richardson, *Modern Scientific Evidence* § 6.18 (1961) (when the expert is used for the purpose of giving an expert opinion on credibility or on personality structure, "traditional" objections are removed and the *Frye* test should not be a bar to admission). We believe the better view is that C.R.E. 702, rather than *Frye*, governs the admission of the testimony in question and we so hold.[8] C.R.E. 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The expert's testimony was limited in scope. She testified concerning the reactions of rape victims generally; none of her testimony concerned this particular victim. She did not interview or contact the victim and did not testify that the victim suffered from rape trauma syndrome or that the victim had been raped. Nor did she express an opinion as to the truthfulness of the victim. The major point of her testimony was that a rape victim who is assaulted by somebody she knows rather than by a stranger is generally more reluctant to report the assault to police because of fear of retaliation. The rape trauma syndrome evidence put in context this explanation of

**7.** *See Marks,* 647 P.2d at 1299; *Huey,* 699 P.2d at 1294; *Allewalt,* 517 A.2d at 746; *see also Taylor,* 663 S.W.2d at 237, 240–41 (although testimony that the victim had been raped or suffered from rape trauma syndrome is inadmissible, rape trauma syndrome is generally accepted as a common reaction to sexual assault and an expert may testify that the victim's symptoms are consistent with a stressful sexual experience). *Contra Bledsoe,* 203 Cal.Rptr. at 457–460, 681 P.2d at 298–301.

**8.** We note that, even if admissible under C.R.E. 702, evidence may be excluded under C.R.E. 403 if its probative value is substantially outweighed by other considerations, such as a danger of unfair prejudice or of misleading the jury. We hold that such considerations are not present in the instant case.

delayed reporting. The trial court allowed the expert testimony after defense counsel informed it that the reporting delay would be the subject of serious attack and after defense counsel vigorously cross-examined the victim about the delay.[9]

Under these circumstances, such expert testimony assists the jury within the meaning of C.R.E. 702 because it is helpful to the jury in determining what effect should be given to the victim's delay in reporting the crime. The lay notion of what behavior logically follows the experience of being raped may not be consistent with the actual behavior which social scientists have observed from studying rape victims. For many years, the law has assumed that a prompt report of a sexual assault renders it more likely that the crime was committed. *See Padilla v. People,* 156 Colo. 186, 397 P.2d 741 (1964); *Davis v. People,* 112 Colo. 452, 150 P.2d 67 (1944); *Donaldson v. People,* 33 Colo. 333, 80 P. 906 (1905). Likewise, the failure to make a prompt report in certain cases is admissible as evidence that a sexual assault did not occur. *See People v. Quintana,* 665 P.2d 605, 610 n. 6 (Colo.1983); *Padilla,* 397 P.2d 741; *Coplin v. People,* 67 Colo. 17, 185 P. 254 (1919); *Donaldson,* 80 P. 906. Expert testimony that challenges or explains these assumptions is valuable information which the jury should hear and consider in its search for the truth. In similar cases, expert testimony has been admitted to explain delays in reporting crimes. *See Smith v. State,* 100 Nev. 570, 688 P.2d 326 (1984) (expert testimony that family members often delay in reporting that the father or father figure has been sexually abusing his children held admissible); *People v. Benjamin R.,* 103 A.D.2d 663, 481 N.Y.S.2d 827 (App.Div.1984) (expert testimony explaining why a victim of sexual abuse is often reluctant to reveal the crime, particularly when the acts are committed in a family setting, held admissible); *Commonwealth v. Baldwin,* 348 Pa.Super. 368, 502 A.2d 253 (1985) (expert testimony concerning the dynamics of intra-family sexual abuse and the psychological forces which cause the victim to keep the incest a secret for a long time held admissible); *State v. Petrich,* 101 Wash.2d 566, 683 P.2d 173 (1984) (expert testimony that a delay in reporting is found in over 50 percent of sexual abuse cases involving child victims held admissible).

■ The testimony of Wyka provided the jury with an explanation for the delay in reporting consistent with the victim's testimony that she had been raped and that she had delayed reporting the rape until after the defendant stopped frequenting the bank because she was terrified of him. Of course, it was not conclusive proof. The trial court properly instructed the jury that it was not bound by the testimony of experts and that it was entirely up to the jury to determine what weight to give to such testimony.[10] Any flaws present in the expert testimony go to the weight to be given the evidence rather than its admissibility and can be the subject of cross-examination of the expert witness. *State v. Marks,* 647 P.2d at 1299.

■ Given the limited scope of the expert testimony which was not used to establish that a crime had been committed but rather to corroborate the testimony of the victim, and given the defense theory which raised the issue, we hold that the evidence was properly admitted under C.R.E. 702. A trial court's decision to allow a

---

9. By the end of trial, the defense clearly had decided to rely on an alibi defense rather than solely impeaching the victim. In his closing argument, defense counsel conceded that "something happened" to the victim, that she had suffered, and that he didn't doubt the validity of the rape trauma syndrome. These remarks undercut any argument that defendant was prejudiced by introduction of the evidence regarding rape trauma syndrome. Where the defendant does not allege a deprivation of his constitutional rights, he has the burden of showing prejudice resulting from the alleged error.

*People v. Vigil,* 718 P.2d 496 (Colo.1986); *Segura v. People,* 159 Colo. 371, 412 P.2d 227 (1966); *see Leonardo v. People,* 728 P.2d 1252 (Colo.1986).

10. Jury Instruction No. 14 read in full: "You have heard witnesses who have testified as experts. You are not bound by the testimony of experts; their testimony is to be weighed as that of any other witness. It is entirely your decision to determine what weight shall be given their testimony."

witness to testify as an expert will not be disturbed without a clear showing of abuse of discretion. *E.g., People v. District Court*, 647 P.2d 1206 (Colo.1982); *People v. Davis*, 187 Colo. 16, 528 P.2d 251 (1974). We find no such abuse of discretion in this case.

■■■■ To the extent that the prosecutor, in his closing argument, used Wyka's testimony to argue that the victim had been raped rather than merely to corroborate her testimony, we disapprove of such action. The trial court had explicitly ruled that the expert testimony was admissible to explain the victim's delay in reporting the crime. The prosecutor transgressed the boundaries of this limited ruling by arguing in closing that the victim's reaction to the assault paralleled Wyka's description of the typical reactions of rape victims. *See United States v. Westbo*, 576 F.2d 285 (10th Cir.1978) (mistrial warranted where government violated the clear intent of the trial court's ruling excluding certain evidence from the government's case-in-chief), *overruled on other grounds, United States v. Hopkins*, 744 F.2d 716 (10th Cir. 1984). Although the defendant's brief before this court does contest this use of Wyka's testimony by the prosecutor, no objection was made at trial during the argument. Where no contemporaneous objection is made to alleged prosecutorial misconduct occurring during his closing argument, C.R.C.P. 52(b) limits appellate review to whether the error or defect rises to the level of plain error. *Wilson v. People*, 743 P.2d 415 (Colo.1987); *Taylor v. People*, 723 P.2d 131 (Colo.1986); *People v. Constant*, 645 P.2d 843 (Colo.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982). Plain error is present only if an appellate court, after reviewing the entire record, can say with fair assurance that the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Wilson v. People*, 743 P.2d 415. Given the testimony of the victim, the testimony of the victim's relatives and acquaintances corroborating her testimony, similar transaction evidence presented whereby another woman described an assault by the defendant substantially similar to the incident for which he was convicted, and the defendant's use of an alibi defense, we cannot say that this impropriety constitutes plain error.[11]

The judgment of the court of appeals is reversed and the case is remanded with directions to reinstate the trial court's judgment of conviction.

LOHR, J., specially concurs.

ERICKSON, J., dissents, and KIRSHBAUM, J., joins in the dissent.

LOHR, Justice, specially concurring:

The majority holds that the trial court properly admitted the testimony of Patricia Wyka, who was qualified as an expert in victimology, in order to help the jury determine what effect should be given to the victim's eighty-nine day delay in reporting the sexual assault. I agree with this conclusion and write separately only to emphasize what I believe to be the narrow scope of this holding. The majority opinion does not approve the admission of rape trauma syndrome evidence generally, or to prove that the victim was raped, or to corroborate the victim's truthfulness, but only to provide an explanation for the victim's delay in reporting consistent with her claim of having been raped. The issues concerning the admissibility of rape trauma syndrome evidence for other purposes is properly left to be addressed on another day.

---

11. The defendant further argues that even if this court finds that the testimony of Wyka is admissible, the defendant's conviction still must be reversed "because of Wyka's minimal training." The defendant did not object on these grounds to Wyka's testimony at any time during trial. Failure to object in the trial court on the grounds asserted on appeal is deemed to be a waiver of the objection unless the alleged error rises to the standard of plain error affecting substantial rights of the defendant. *See People v. Taggart*, 621 P.2d 1375 (Colo.1981); *People v. Watson*, 668 P.2d 965 (Colo.App.1983); Crim.P. 52(b); C.R.E. 103. For the reasons stated in the text preceding this footnote, as well as the limited nature of the testimony and the instruction given by the trial court, any error committed did not constitute plain error.

In this case the victim did not report the sexual assault until eighty-nine days after it had occurred. The trial court admitted the testimony of Wyka after defense counsel informed the court that the reporting delay would be the subject of serious attack, and after defense counsel vigorously cross-examined the victim about the delay. As the Supreme Court of California noted in *People v. Bledsoe*, 203 Cal.Rptr. 450, 457, 681 P.2d 291, 298 (Cal.1984):

> [I]n such a context expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths.

Wyka did not testify that the victim had been raped or even that she suffered from rape trauma syndrome, but instead testified generally about the reactions of rape victims. Her testimony provided the jury with an alternative explanation for the reporting delay, and was properly admitted because of its relevance for this limited purpose.

ERICKSON, Justice, dissenting:

I respectfully dissent. The majority opinion may only mean that "rape trauma syndrome" evidence is properly admitted to explain delay in reporting a rape or sexual assault. However, it can be given a broader interpretation that does violence to or overrules existing precedent. *See People v. Anderson*, 637 P.2d 354 (Colo.1981). The unmistakable impact of the "rape trauma syndrome" evidence in this case was to bolster the victim's testimony and to prove that a rape actually occurred. The testimony relating to the rape trauma syndrome went beyond explaining the delay in reporting the assault and for that reason I would affirm the court of appeals reversal of the defendant's conviction and order a new trial.

In this case, Officer Wyka, head of the Victim Services Unit of the Colorado Springs Police Department, did not examine the victim, but was qualified as an expert on victimology. The prosecution justified the admission of her testimony on the theory that the victim had not reported the assault for eighty-nine days and that the defense would rely on the delay to establish consent. The defendant, however, did not rely upon the reporting delay but upon an alibi defense. Without determining if the evidence satisfied *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), the trial court admitted Wyka's testimony, over objection, as to her experience in dealing with sexual assault victims and to the various symptoms of the rape trauma syndrome. To add credibility to the opinion of Officer Wyka and to establish that the victim was in fact raped, the prosecution called a number of witnesses, who knew the victim, to testify that she displayed the symptoms and reactions that Officer Wyka identified in the rape trauma syndrome.

In my view, the testimony and arguments relating to the rape trauma syndrome were improperly admitted because the trial court made no finding that the evidence satisfied the *Frye* test. When the *Frye* test is satisfied, evidence of symptoms indicating that a person is a rape victim may be admissible to prove that she in fact was raped. To admit the untested testimony under the title, "rape trauma syndrome," however, permits a conclusion that a sexual assault occurred even though the syndrome may be caused by other unidentified traumatic events.

In the court of appeals opinion, Judge Metzger, speaking for a unanimous court, analyzed the admissibility of rape trauma syndrome testimony under the general scientific acceptance standard in *Frye* and concluded that the danger of prejudice outweighed the probative value of the evidence. *People v. Hampton*, 728 P.2d 345 (Colo.App.1986). Although I agree with Judge Metzger's conclusion that the *Frye* test applies to rape trauma syndrome testimony, I believe that the case should be remanded to permit the trial court to apply the *Frye* test to the facts of this case. The court of appeals creates a per se exclusionary rule for rape trauma syndrome testimony that does not permit consideration of the purpose for which the testimony is offered or its reliability. In my view, the

potential unreliability of rape trauma syndrome testimony requires that the *Frye* test be applied by the trial court on a case-by-case basis.

In *Frye v. United States,* the court refused to admit the results of a systolic blood pressure deception test, which is akin to a lie detector test, to show that the defendant was telling the truth. The court stated in *Frye* :

> Numerous cases are cited in support of this rule. Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Frye,* 293 F. at 1014. The *Frye* test has been adopted in Colorado to insure the reliability of scientific testimony. *People v. Anderson,* 637 P.2d at 354. I see no reason to abandon our use of the *Frye* test in favor of CRE 702 in light of the extensive authority from other jurisdictions which holds that "rape trauma syndrome" evidence may be inadmissible under the *Frye* test.

In my view, the admissibility of "rape trauma syndrome" evidence under the *Frye* test is far from certain. Other jurisdictions, which have addressed the admissibility of "rape trauma syndrome" evidence, have found it unreliable under the *Frye* test to prove that a sexual assault occurred. *See, e.g., People v. Bledsoe,* 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291 (1984); *People v. Pullins,* 145 Mich.App. 414, 378 N.W.2d 502 (1985); *State v. Saldana,* 324 N.W.2d 227 (Minn.1982); *State v. Taylor,* 663 S.W.2d 235 (Mo.1984). The syllogistic reasoning behind the admission of rape trauma syndrome evidence is that all rape victims have the rape trauma syndrome. Accordingly, since this victim has the rape trauma syndrome, she has been raped. This logic falsely indicates that all rape victims suffer from the same symptoms.

Recognition of the symptoms of the rape trauma syndrome in a victim may not prove that a rape occurred. Rape is a traumatic experience that may create the same symptoms in most victims. The rape trauma syndrome is a subcategory of post-traumatic stress disorder, which refers to the development of symptoms following a psychologically traumatic event not generally encountered in human experience. Smith, *Post Traumatic Stress Disorder,* 20 Trial 92 (1984); American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 236 (3d ed. 1980). Post-traumatic stress disorder and its characteristic symptoms may occur in victims of all violent crimes including rape. Characteristic symptoms identified by the American Psychiatric Association include reoccurring nightmares about the traumatic incident, headaches, sleep disturbance, and diminished responsiveness to the outside world. American Psychiatric Association, *supra* at 237. Since the symptoms of the rape trauma syndrome may follow any traumatic incident, an expert's testimony about the rape trauma syndrome leads to the questionable conclusion that all people who have suffered a severe trauma and have the symptoms of the rape trauma syndrome have been raped. In many instances, trauma that causes the syndrome may not involve rape. *People v. Bledsoe,* 36 Cal.3d at 250–251, 203 Cal.Rptr. at 460, 681 P.2d at 301 ("Although there are patterns that have been observed, the ongoing studies reveal that a host of variables contribute to the effect of rape on its victims … '[c]learly, the concept of a typical rape victim has no place within the context of post rape adjustment.' "); *State v. Saldana,* 324 N.W.2d at 229 ("The characteristic symptoms [of the rape trauma syndrome] may follow *any* psychologically traumatic event.").

Unlike fingerprints, blood tests, lie detector tests, or voice prints, the rape trauma syndrome was not designed to determine whether the victim was in fact raped. Instead, it was developed by professional

rape counselors as a therapeutic tool to help identify, predict, and treat emotional problems experienced by patients. *People v. Bledsoe*, 36 Cal.3d at 249–250, 203 Cal. Rptr. at 459, 681 P.2d at 300; *State v. Saldana*, 324 N.W.2d at 230; Note, *Checking the Allure of Increased Conviction Rates: The Admissibility of Expert Testimony on Rape Trauma Syndrome in Criminal Proceedings*, 70 Va.L.Rev. 1657 (1984) (concluding that expert testimony about the rape trauma syndrome is inadmissible under the *Frye* test). Because it was developed as a therapeutic and not as a diagnostic tool, it may not be sufficiently reliable in determining whether a rape occurred to satisfy the *Frye* test.

Because rape trauma syndrome evidence has the potential to produce unreliable testimony, I do not believe a per se rule of admissibility, as endorsed by the majority, is desirable. At the same time, I believe that a per se rule of inadmissibility, as endorsed by the court of appeals, is unnecessarily stringent and may well result in the exclusion of testimony that is sufficiently reliable to satisfy the *Frye* test. In my view, the reasoning of the Idaho Supreme Court, regarding the creation of a per se rule in the context of hypnotically induced testimony, is insightful:

> While each of the ... approaches discussed above have merit, they all advocate to a greater or lesser extent a *per se* rule of admissibility or inadmissibility which is inconsistent with the general trend of witness competency that every person is competent to be a witness. While each of the ... approaches focuses on an important consideration to be evaluated by a trial court in determining competency, they do so to the exclusion of other considerations, and thus unnecessarily tie a trial court's hands in determining the competency of a witness to testify. If we were to adopt the rule that hypnotically induced testimony should be left to cross examination and impeachment, there would still be circumstances where testimony admitted under that rule had been rendered tainted and unreliable due to the methods used in hypnosis. Thus, a *per se* rule of admissibility would in some circumstances allow for the admission of unreliable testimony, an undesirable result in our judicial system, where we strive to reach verdicts based only on reliable testimony. On the other hand, a *per se* rule of inadmissibility ... would, in some circumstances, disallow reliable testimony, thus thwarting the truth seeking function of our judicial system.

*State v. Iwakiri*, 106 Idaho 618, 624, 682 P.2d 571, 577–78 (1984); *see People v. Romero*, 745 P.2d 1003 (Colo.1987) (advocating a case-by-case approach for determining whether posthypnotic testimony is sufficiently reliable to be admissible).

Accordingly, I would reverse and order a new trial.

I am authorized to say that KIRSHBAUM, J., joins in this dissent.